**People of the State of Illinois, Plaintiff-Appellee, v. Robert E. Long, Defendant-Appellant.**

**Gen. No. 69–80.**

Second District.

January 19, 1970.

75

John T. Beynon, Public Defender, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney of Winnebago County, of Rockford, and John C. Tower, Assistant State's Attorney, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

The defendant, Robert E. Long, was found guilty of murder after a bench trial, and sentenced to a term of

30 to 40 years. His appeal is based solely on the claim that his extrajudicial statements were admitted in violation of his constitutional rights.

Joyce Armstrong testified that she had been a co-worker with the defendant in a restaurant in Beloit, Wisconsin. On November 4th, 1968, at the end of their shift at the restaurant, she asked the defendant for a ride home; he went into the bathroom and after an interval he called out to her and she ran into the room. Defendant was sitting on a trash can, crying. There was blood on his face and hands and on the wash bowl. When the witness asked what was wrong, defendant replied, "I am killing myself." When she asked "Why?", he said, "I strangled my girl friend in Chicago." He mentioned the name, "Betty," whom the witness had met previously.

The Beloit police were called to the restaurant and defendant was taken, unwillingly and under restraint, to the hospital in an ambulance.

At the hospital emergency room it was determined that both the defendant's wrists were slashed, superficially, and he had two minor stab wounds in the chest and a serious wound in the abdominal region. The latter caused profuse bleeding and necessitated a transfusion and later surgery.

James Mattison, Jr., Captain of the Beloit police, testified that he identified himself to defendant in the emergency room immediately after the defendant's arrival there, and while defendant was being restrained on the table and with the nurses treating him for the wounds. He told defendant that he had a right to remain silent, that what he said could be used against him in court, that he had a right to have an attorney present at the questioning or consult with one before being questioned, and that if he couldn't afford one the State would provide one. He further testified,

"I asked him if he understood these rights and he said he did. And I asked him if he still wanted to talk to me about this incident, and he said yes. . . . I asked him if it was true that he had killed someone, and he said yes, he had. I asked him, and he said his girl friend, Betty Vollenweider. . . . I then asked him for details as to what he did with the body, and he stated that at that time he didn't wish to discuss it any further, he just wanted to die with her. I didn't question him any further after that."

Daniel Hartnett, a Chicago policeman, testified that he found Betty Vollenweider's body in Chicago on the morning of November 4th, and that there were visible marks, indicating strangulation, on her neck. After identification, he went to Beloit on November 5th and identified the victim's car in the police garage (where it had been removed from the restaurant parking lot). In the trunk of the car he found approximately 15 feet of plastic clothesline, among other items. He then went to the Beloit Hospital, and after speaking to the head nurse and securing the permission of defendant's attending physician, Dr. Carter, he spoke to defendant in the intensive care section. He testified to giving defendant warnings, substantially in the same terms as officer Mattison had testified, and to defendant's reply that he understood and was willing to give a statement. This was at about 4:10 or 4:15 in the afternoon and in the presence of the witness, detective Miller of his department, and a patrolman from the Beloit police department, defendant then gave a complete confession.[1]

[1] He said that he had quarreled with his girl friend Betty Vollenweider in his apartment in South Beloit in the early morning of November 3rd; that he strangled her with a piece of "plastic string" from her car; and after remorsefully holding the body until the early morning of November 4th, he took it to Chicago and dropped it off near the victim's home, then returned to South Beloit.

The autopsy confirmed that asphyxia due to strangulation, due to ligature caused the death.

Detective Miller testified to substantially the same facts. Each officer said that he did not know that defendant had refused to talk further with officer Mattison. Each officer testified that defendant first said he would give a written statement and when it was typed and shown to him defendant refused to sign.[2]

Millard Wertman, Jr., a Winnebago County Deputy Sheriff, testified that he, with Detective Wright of his department, went to the intensive care section of the Beloit Hospital on November 7th, after contacting Dr. Carter, and advised defendant of his rights, reading them from a printed card.[3] The witness said that defendant answered that he understood and he then proceeded to give the same detailed confession he had previously related to the Chicago officers. Defendant refused to sign a mimeograph form offered to him after the statement which was an acknowledgment that his remarks were voluntary and which waived his constitutional objections. He had previously indicated that he would give an oral statement and not a written or a signed one. Wright's testimony was fully corroborative of Wertman.

Defendant Long took the stand to testify merely with reference to his alleged statements. He denied he had ever seen any of the officers claimed to have questioned him and could not recollect ever talking to any of them.

[2] At the hearing on the motion to suppress Officer Hartnett testified that he and Detective Miller returned to the hospital at about 5:00 o'clock and further questioned defendant. This statement, however, was not introduced at the trial.

[3] Defendant does not claim that his rights under Miranda were not fully set forth on the card, but argues that reading from a card is bound to be perfunctory and does not amount to a guarantee of an explanation which a defendant can fully understand. But see State v. Pullen (Ore), 449 Pac2d 850 (1969); State v. Thornton, 22 Utah2d 140, 449 Pac2d 987, 988 (1969).

He stated that his first recollection in the hospital was after six or seven days of his nine-day stay.

It is clear from the record that the State, while it could show by the testimony of Joyce Armstrong that the defendant volunteered that he had strangled Betty Vollenweider, and could prove the corresponding cause of death, offered no proof of the essential element of venue outside of the defendant's own statement. (This is true whether you consider defendant's voluntary statement to mean that he strangled the victim *in Chicago* or that he strangled his *Chicago girl.*)

Defendant argues that "the crux of the case revolves around the fact that there were three separate law enforcement agencies questioning the defendant." He contends that when defendant refused to answer further questions put to him by Captain Mattison, a "heavy burden" was placed upon later interrogators to show an intelligent and knowing waiver in subsequent statements, and that this burden was not sustained within the purview particularly of the case of Miranda v. Arizona, 384 US 436, 16 L Ed2d 694, 733 (1966), and the companion case of Westover v. United States, 384 US 436, 16 L Ed 2d 694, 735 (1966). The subordinate point is made that the influence of defendant's physical condition and the drugs administered at the hospital prevented his intelligent understanding and knowing waiver. And a final question is posited, whether a defendant must affirmatively state a waiver of his rights rather than waive them impliedly by talking after acknowledging his understanding of those rights.

With reference to the main stream of defendant's argument, we are to consider the import of Miranda, supra, at page 723 (L Ed2d),

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning,

80

that he wishes to remain silent, the interrogation must cease.

While defendant agrees that Mattison complied with Miranda, he contends that the subsequent interrogation by, first the Chicago, and finally the Winnebago authorities, did not. Defendant cites Westover, supra, to support this contention. In Westover, the defendant had been interrogated at length by Kansas City authorities over a fourteen hour period of custody, with reference to an alleged Kansas City crime, with no admonition of his rights. The F.B.I. then began their questioning relative to a different offense alleged to have occurred in California. The F.B.I. interrogation was continued in the Kansas City Police Station. While the F.B.I. agents advised defendant of his rights there was no evidence of the defendant's response, except that he began to give the statement. The court held that the confessions to both the Kansas City and the California offenses, secured after a short period by the agents, were received in the course of a continuous period of questioning; and that the failure to give the warnings at the beginning of the Kansas City interrogation without an "articulated waiver," after the F.B.I began its inquiry, made the statements as to the California offense inadmissible. The court considered the F.B.I warnings to have been made "at the end" of the interrogating process.

██ Westover, supra, at page 736 (L Ed2d) does not preclude questioning by successive and different law enforcement agencies under circumstances which show that the later interrogators are not the "beneficiaries of the pressure applied by the local in-custody interrogation," and where proper warnings have been given. We believe that this is such a case. A number of state court cases decided since Westover take a similar view. See State v. Godfrey, 182 Neb 451, 155 NW2d 438, 442 (1968) ; State v. Bishop, 272 NC 283, 158 SE2d

511, 520 (1968); People v. Fioritto, 64 Cal Rptr 797, 800 (1968).

The record confirms that the State has satisfied its burden of showing a knowing and intelligent waiver of defendant's constitutional privileges against self-incrimination and the right to counsel before his statements became admissible. The evidence of the giving of the Miranda warnings does not suggest a perfunctory or mechanical approach, but rather a careful one. Captain Mattison terminated his questioning as soon as defendant indicated he wanted to be "left alone and to die." That statement by defendant did not preclude further voluntary statements by him at some other time. Officer Hartnett testified that he told defendant he could stop the conversation at any time he saw fit after he had given the usual warnings. In fact, the record strongly suggests that from his first volunteered statement at the restaurant, defendant was remorseful and quite willing to unburden himself of his guilt and sorrow, and that there was no use of psychological "ploys," or any overbearing on the part of the authorities in the relatively short period of the actual questioning.

Defendant takes the position that it is not sufficient that one merely state that he understands the rights which have been explained to him in full, but that he must affirmatively renounce these rights. However, circumstances of a defendant freely answering questions, after explanation of his rights, is sufficient to rebut the normal presumption against waiver of constitutional rights. The People v. Hill, 39 Ill2d 125, 133, 233 NE2d 367 (1968).

We have also given careful consideration to the argument of defendant that his physical condition and the ingestion of drugs resulted in his inability to intelligently and knowingly waive his Miranda rights.

■ At the time of Captain Mattison's questioning, while defendant was suffering from a severe physical injury, there is no evidence that his comprehension was impaired. He was firm in his violent struggle to be left alone to die. His mental condition rather than his physical condition is most material on this record. See State v. Wise, 19 NJ 59, 115 A2d 62, 80–81 (1955).

Thereafter, Long was given an analgesic and sedative, Demerol, to relieve pain and as a relaxant. The dosage was 75 milligrams, which Dr. Carter testified would be dissipated in approximately 3 to 4 hours, and would have no effects on the brain. Dr. Carter further testified that the dose given Long, in his opinion, would not weaken his ability to understand; that the generic name of Demerol is meperidine hydrochloride; that the 75 milligram dose is not a large one for an average-size man. He further testified that if the drug were administered within an hour of questioning, it might have an effect on the party's inhibitions, but would not affect his ability to understand questions.

Before defendant was questioned by the Chicago authorities on November 5th, and on Dr. Carter's orders, the medication was withheld for 3 hours prior to the questioning.[4]

Defendant was next questioned by the Winnebago County authorities, apparently after venue in that

[4] 75 milligrams of Demerol were given to Long at 11:40 a. m. on November 5th. The questioning began shortly before 4:00 p. m. After the officers left, defendant was given another 75 milligram dosage at 4:30, and the officers returned shortly after 5:00 o'clock when a second statement was taken. However, the second statement was not introduced although it was substantially the same as the first statement and was corroborative of it. Officer Hartnett testified that defendant acted and talked no differently the second time he saw him on November 5th than at the first time.

83

county became known from defendant's statement to the Chicago officers. Long was given the 75 milligrams of Demerol at 9:40, but no further medication was given until after the interrogation took place. The questioning began at approximately 12:15 p. m.

The fact that the statements corroborated each other also lends support to the conclusion that the drug, Demerol, at no time affected Long's ability to comprehend. Defendant did not testify at the hearing on the motion to suppress the statements. He did, however, testify at the trial that he was unaware of *any* interrogation or interrogators. This testimony is inherently unbelievable in view of the medical testimony, (including that of a nurse who testified that on the 5th thru the 7th of November his general attitude towards conversation was good, he was very conversive, and seemed cooperative) and defendant's successive, consistent and detailed statements.

■ We conclude that the trial court correctly permitted the introduction of defendant's statements as voluntary after a knowing and intelligent waiver of defendant's constitutional rights.

We, therefore, affirm the judgment below.

Affirmed.

DAVIS, P. J. and MORAN, J., concur.