STATE of Iowa, Appellee,

v.

William Henry VINCIK, Appellant.

No. 85–1125.

Supreme Court of Iowa.

Jan. 14, 1987.

Leon F. Spies, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., Pamela Greenman Dahl, Asst. Atty. Gen., Denver D. Dillard, Co. Atty., and Harold Denton, Asst. Co. Atty., for appellee.

WOLLE, Justice.

Defendant William Henry Vincik was arrested and charged by trial information with the first-degree murder of his wife, Inez Vincik. The jury found him guilty of murder in the second degree and he was sentenced to an indeterminate term of fifty years in prison. *See* Iowa Code §§ 707.1, 707.3, 902.9(1) (1983). In this direct appeal from the judgment of conviction Vincik asserts seven separate assignments of error: two of constitutional dimension concerning motions to suppress an inculpatory statement and certain physical evidence seized during a warrantless search of his home; and the other five pertaining to the trial court's denial of a requested protective order during discovery, refusal to give a re-quested jury instruction, and exclusion of certain proffered expert testimony. We conclude that Vincik was deprived of a fair trial when the prosecution used in evidence against him an inculpatory signed statement police officers coercively extracted from him while his mind was clouded by drugs administered by medical professionals. We reverse the conviction and remand this case for a new trial.

I. *Motion to Suppress Post-Arrest Statement.*

Vincik first assigns as error the refusal to sustain his motion to suppress an inculpatory statement allegedly given to police officers two weeks after his wife had been shot and killed. He contends he did not voluntarily waive his *Miranda* rights and did not voluntarily give the police officers an inculpatory statement which later was admitted in evidence against him at trial. He contends the prosecution's use of that statement violated his rights under the fifth and fourteenth amendments to the United States Constitution. *See Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719 (1966). (Vincik in this appeal has abandoned a sixth amendment challenge presented to the trial court.) We review *de novo* the record concerning such constitutional issues, making our own independent evaluation of the totality of the relevant circumstances. *State v. Nelsen,* 390 N.W.2d 589, 591 (Iowa 1986); *State v. Whitsel,* 339 N.W.2d 149, 152 (Iowa 1983).

The burden of proof was on the State to prove by a preponderance of the evidence that Vincik's waiver of constitutional rights was knowingly, voluntarily and intelligently given. *See State v. Reid,* 394 N.W.2d 399, 402 (Iowa 1986). An express written waiver alone is not enough to establish waiver. *Fryer v. State,* 325 N.W.2d 400, 409 (Iowa 1982). The State also has the burden of establishing by a preponderance of the evidence that the defendant's inculpatory statement was made voluntarily. *State v. Hodges,* 326 N.W.2d 345, 347 (Iowa 1982). Thus, the voluntari-

ness of both the waiver and the statement is at issue.

The test for voluntariness is whether the "totality of circumstances" demonstrates that the statement was the "product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired." *Id.* (quoting *State v. Snethen*, 245 N.W.2d 308, 311 (Iowa 1976)). Other factors to be considered include:

> The defendant's knowledge and waiver of his *Miranda* rights, the defendant's age, experience, prior record, level of education and intelligence, the length of time defendant is detained and interrogated, whether physical punishment was used, including the deprivation of food or sleep, defendant's ability to understand the questions, the defendant's physical and emotional condition and his reaction to the interrogation, whether any deceit or improper promises were used in gaining the admissions, and any mental weakness the defendant may possess.

*State v. Whitsel*, 339 N.W.2d at 153. It is also now clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" under the fourteenth amendment. *Colorado v. Connelly*, — U.S. —, —, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986).

A few of the background facts on this issue are undisputed. Shortly after noon on June 26, 1984 the Cedar Rapids Police Department received a "911" call from a person who identified himself as Bill Vincik and reported that he had been shot. Ambulance and police cars were dispatched to Vincik's home, where Vincik and his wife Inez were discovered lying on a bed, with bullet wounds to the head. Inez was dead and Vincik unconscious. Vincik was taken to a Cedar Rapids hospital where he underwent major surgery.

On July 9, 1984, at about 4:30 p.m., Vincik was arrested by two Cedar Rapids police officers at the Veterans Administration Hospital in Iowa City where he had been taken to recuperate from brain and eye surgeries. Hospital personnel released Vincik, in a wheelchair, into the custody of the two police officers, and they transported him to the Cedar Rapids police station. There, in a windowless room ten feet square, from about 5:45 p.m. to 8:45 p.m., the two police officers interrogated Vincik. In the first few minutes Vincik was read and then signed a standard rights waiver form. About three hours later Vincik signed a typewritten statement which first had to be read to him because he could not see very well. No notes were taken and no audio or video tape was made of the questioning. The two-page typewritten statement Vincik signed referred to his recollections of violent Vietnam war experiences, recent suicidal thoughts brought on by those experiences, and recollection of the events on the day his wife Inez and he were shot. Included are three blunt statements:

> I got this gun out of the dresser and while Inez was sleeping I shot her twice in the head. The reason I shot her twice is I did not want her to suffer. I laid down next to her in the bed and then shot myself.

Before Vincik was questioned, he was charged by trial information with murder in the first degree. After the typewritten statement was signed Vincik spent the night in jail. The following day he was arraigned on the murder charge, then readmitted to the Veterans Administration Hospital.

The critical detailed facts relevant to the question of voluntariness are very much in dispute. The State's version, based almost entirely on testimony of the two police officers and their secretary, focuses on Vincik's apparent understanding of what was taking place from the time he was arrested until he signed the statement.

The officers testified that they arrested Vincik only after receiving a phone call from hospital personnel notifying them that Vincik would be released from the hospital that afternoon. They maintain that Vincik was alert throughout the time he was with them, even joking while they

slowly climbed the thirty steps into the police station. Although conceding that defendant had obvious physical problems—a head wound, visible catheter, and difficulty with eyesight—they emphasized that his verbalizations were appropriate and understandable and that he stated he understood the waiver form when it was read to him. They said they made no threats or promises and that Vincik never requested that the questioning cease but complained only that his eyes were dry. They said they administered eyedrops when requested, provided soda pop, and allowed Vincik to use the restroom on one occasion. They both testified the words in the typewritten statement were taken directly from Vincik's answers to their questions, then dictated by one of the officers at the completion of the questioning and typed by a secretary. Finally, the officers emphasized that they not only read the typed statement to Vincik before he signed it, but they made corrections at his request and had him initial those corrections.

Vincik's version of the facts on this issue, based largely on testimony of medical personnel, emphasizes overreaching by the police officers given Vincik's infirm mental and physical condition just before and during the hours when he was being interrogated. The hospital chief of ward administration who phoned the officers on the morning of July 9 testified that she phoned to notify them of Vincik's discharge only because they earlier had asked her to phone when the neurosurgeons were ready to release him from the hospital. She told them he still was in need of a psychiatric evaluation, and she understood that the police officers were planning to take Vincik to the care facility at Oakdale for a necessary psychiatric evaluation. When discharged, Vincik had only enough medicine for that night and the next morning. Doctors and nurses at the hospital all testified that they assumed from what the police officers told them that Vincik was merely being moved to Oakdale for further treatment. The officers did not tell hospital personnel they had a warrant for his arrest and were going to drive him straight to Cedar Rapids for interrogation.

Although hospital personnel turned over to the police officers Vincik's medical records, the officers neither read those reports nor discussed Vincik's condition with qualified medical personnel when they took him into custody. The officers testified they were not aware he had just undergone a surgical procedure and been injected with the drug valium, a sedative. Indeed, one of the officers described as "excellent" Vincik's medical and mental condition upon discharge into their custody. The officers' testimony concerning Vincik's mental and physical condition is not credible when all of the evidence in this record is considered. A neurosurgeon testified that the type of brain damage suffered by Vincik frequently results in a lack of inhibition and a lack of appropriate response to questions and situations. Hospital records disclosed that medication—phenobarbital and dilantin—had been and was to be administered to Vincik three times daily. The neurosurgeon testified that phenobarbital is a sedative. He testified further that Vincik's emotional status was variable during his hospitalization prior to and including July 9, and that while Vincik was able to recall on the morning of July 9 his full name, where he was, and that he suffered from a gunshot wound, there were times that he could not state his age correctly. A psychologist testified that on the morning of July 9 when he tried to interview Vincik, Vincik became fatigued after twenty or thirty minutes of conversation and began misstating words.

The hospital records show that on the afternoon of July 9 a surgical procedure was performed in connection with a catheter that had been inserted through Vincik's abdominal wall. A total of twenty milligrams of valium was given Vincik in graded doses intravenously between 2:40 p.m. and 3:00 p.m. According to the medical testimony the "mental status" of one who has been given valium would "not be as good as it had been prior" to being given the drug. The neurosurgeon testified that the average adult male given twenty milli-

grams of intravenous valium would probably be "considered not responsible for his actions or responses for a period of approximately six hours." Moreover, he explained that valium, when combined with phenobarbital, tends to increase the sedative properties of each drug. He said that Vincik was not in any physical or mental condition on July 9 to be interrogated, and he would not have discharged Vincik if he had known that the officers planned to interrogate him.

Hospital employees and family members testified that following his surgery on July 9, Vincik was difficult to arouse, was incapable of intelligent conversation, and needed the assistance of two nurses in using the restroom. The discharge summary, written prior to Vincik's release to the police at approximately 4:30 that afternoon, indicated that his verbalizations were "inappropriate" and he appeared "disoriented" and "unaware of what is going on." The psychologist asserted, "I have virtually no confidence in that confession."

An attorney retained by Vincik's family testified that he talked with him on the phone soon after the police had completed their interrogation. He said he had difficulty understanding Vincik's responses to his questions. He asked Vincik if he understood what he had signed, and Vincik indicated he had not. The jail nurse, who saw Vincik on the morning of July 10 after his night in jail, testified that Vincik complained to her of the discomfort the catheter was causing him. She noted an abnormally low urine output in his catheter bag, consistent with evidence that when Vincik was readmitted to the hospital his catheter was not working properly.

Defendant testified at trial that he did not remember leaving the hospital before being questioned and did not know where he was going or who was talking to him. He remembered signing something but denied the accuracy of numerous details in the typewritten statement and said, "Those are not my words nor my statement." He denied that he had shot his wife and testified that on the day in question two men had entered his home and shot both his wife and himself.

From our de novo review of the record we conclude that the State did not sustain its burden to prove that Vincik voluntarily waived his *Miranda* rights and voluntarily gave the statement which was used against him. *See State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975). We find credible the medical evidence concerning the adverse effect the valium injections had on Vincik's capacity to know and understand what he was saying. The last injection occurred less than three hours before the police obtained the signed waiver and began interrogating him. Clearly Vincik was not alert and capable of giving meaningful answers to questions during the six hours after the valium had been administered to him at the hospital, the period when he signed both the waiver and the inculpatory statement.

The circumstances of this case also satisfy the *Connelly* requirement that a confession, to be suppressed as involuntary, must be the product of coercive police activity. *Colorado v. Connelly,* —— U.S. at ——, 107 S.Ct. at 522, 93 L.Ed.2d at 484. We cannot divorce Vincik's infirm mental and physical condition from the police officers' actions here. Vincik did not walk up to these two officers and offer to talk about a crime; he was arrested at the hospital and hauled to the Cedar Rapids police station for interrogation. *Compare Connelly, id.* at ——, 107 S.Ct. at 518, 93 L.Ed.2d at 479 (defendant approached uniformed police officer and, unprompted, "stated that he had murdered someone and wanted to talk about it"). When the interrogation began, the officers knew Vincik had been charged with murder and that no counsel was present to represent him during the interrogation. They also knew enough about his infirm mental and physical condition to raise serious doubts in their minds whether the custodial circumstances of the questioning would produce voluntary and meaningful statements. We conclude Vincik's capacity for self-determination was critically impaired by the drugs' effect on his al-

ready debilitated condition, and his reduced resistance was overborne by the officers. *See Cullison,* 227 N.W.2d at 127.

■ Courts in other jurisdictions have excluded from evidence confessions given by patients following the administration of drugs as part of medical treatment, when the effects of the drug have not worn off prior to the questioning. *See, e.g., In re Cameron,* 68 Cal.2d 487, 502–03, 439 P.2d 633, 641–42, 67 Cal.Rptr. 529, 538 (1968); *Reddish v. State,* 167 So.2d 858, 863 (Fla. 1964); *State v. Graffam,* 202 La. 869, 890, 13 So.2d 249, 256 (1943). The mere fact that one is under the influence of a drug while making an inculpatory statement does not render the statement involuntary. *State v. Wilson,* 264 N.W.2d 614, 614–15 (Iowa 1978). This case, however, is unlike those in which medical testimony established that the effects of the drug had worn off prior to questioning, and those where the drugs had no adverse effect on the ability of the patient to think rationally. *See, e.g., People v. Dacy,* 5 Cal.App.3d 216, 220, 85 Cal.Rptr. 57, 58 (1970); *People v. Kincaid,* 87 Ill.2d 107, 120, 57 Ill.Dec. 610, 615, 429 N.E.2d 508, 513 (1981), *cert. denied,* 455 U.S. 1024, 102 S.Ct. 1726, 72 L.Ed.2d 144 (1982); *People v. Pote,* 5 Ill. App.3d 856, 858, 284 N.E.2d 366, 368 (1972); *People v. Long,* 119 Ill.App.2d 75, 83, 255 N.E.2d 491, 495 (1970); *State v. Hoskins,* 292 Minn. 111, 131, 193 N.W.2d 802, 815 (1972); *State v. Wade,* 40 N.J. 27, 35–36, 190 A.2d 657, 661–62, *cert. denied,* 375 U.S. 846, 84 S.Ct. 100, 11 L.Ed.2d 73 (1963).

Vincik's confession was the product of tough police interrogation and a mind enfeebled by brain damage, a surgical procedure, fatigue, medication and drugs. We find credible the medical testimony concerning the severity of Vincik's brain damage, the adverse effects upon him of the medication and drugs administered during the surgery that afternoon, and his infirm and fatigued mental and physical condition that evening. Vincik was not capable of giving to the interrogating police officers, and did not give, the kind of knowing and voluntary statement that could constitutionally be used in evidence against him.

The signed waiver and inculpatory statement should have been suppressed and excluded from evidence at trial. Defendant's conviction therefore must be reversed and the case remanded for a new trial.

## II. *Motion to Suppress Evidence Seized From Home.*

Vincik also moved to suppress physical evidence police officers found during the several warrantless searches of his home that followed his telephoned report that his wife and he had been shot. The trial court sustained the motion with respect to evidence seized several hours after the officers first entered the home but overruled that part of the motion which sought suppression of evidence found in the initial search of the home. Consequently, the prosecution was allowed to use in evidence at trial the handgun that fired the fatal shot and a holster, cartridges, slugs, and a gun box. The trial court denied Vincik's fourth amendment challenge, explaining:

> Once the officers were inside, they were entitled to make a general search of the premises under the totality of the circumstances. This is because there was a danger of violence and injury to the officers and others because it was unclear as to who may have fired the shots that killed Mrs. Vincik and wounded Mr. Vincik. There was certainly the risk of a subject's escape, and there was the possibility that unless a search was made on the spot, evidence would be concealed or destroyed.... [T]heir search corresponded to the exigency at the time they were in the residence.

Defendant contends in this appeal that his trial counsel rendered ineffective assistance in stipulating at the suppression hearing that the motion did not include several items taken from the bedroom, including the handgun. He argues that those items should without question have been suppressed as the products of an unconstitutional warrantless search of Vincik's home, basing his argument on *Thompson v. Loui-*

*siana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984).

In *Thompson*, deputies responded to a phone call from the defendant's daughter reporting an attempted murder-suicide. Upon arriving at the defendant's home, the deputies transported the defendant to a hospital while securing the scene. The officers then conducted a warrantless two hour follow-up investigation in which they discovered a pistol in a chest of drawers, a note in a wastebasket, and a letter in an envelope on top of the chest of drawers. The United States Supreme Court, finding that an impermissible warrantless search had occurred, reaffirmed its position outlined earlier in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), that there is no "murder scene exception" to the warrant requirement. *Thompson*, 469 U.S. at 20, 105 S.Ct. at 411, 83 L.Ed.2d at 250–51. The Court wrote that a warrantless search of a murder scene may be justified and permissible to the extent that it constitutes "a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises," *id.*, but the Court refused to extend this exception to permit the warrantless seizure of evidence "not discovered in plain view while the police were assisting defendant to the hospital." 469 U.S. at 22, 105 S.Ct. at 412, 83 L.Ed.2d at 251. The Court in *Thompson* also discussed the State's claim that it had established valid consent for a search by showing that defendant's daughter originally permitted the police to enter the home. The Court stated that "the issue of consent is ordinarily a factual issue unsuitable for our consideration in the first instance" and remanded the case for consideration of the consent issue in the light of earlier Court decisions. *Id.* at 22, 105 S.Ct. at 412, 83 L.Ed.2d at 252.

We need not and do not resolve this fourth amendment issue raised by defendant because the trial court has not addressed the question of consent and, in any event, this case must be remanded for further proceedings. Prior to a second jury trial, the trial court shall decide such fourth amendment issues as defendant's

trial counsel presents in a renewed motion to suppress. Defendant's counsel may raise all appropriate grounds for suppression of physical evidence without being bound by the stipulation here challenged, and the State may contend that Vincik consented to the search. We therefore do not address the question of ineffectiveness of counsel argued in this appeal. We note that the trial court did not rely on that stipulation in overruling defendant's earlier motion to suppress.

### III. *Other Issues.*

We address several of Vincik's other assignments of error which concern issues likely to arise upon retrial.

A. *The Requested Protective Order.* Pursuant to Iowa Rule of Criminal Procedure 13(2)(b)(1), entitled "Discretionary discovery", Vincik filed a pretrial motion for an order permitting him to have experts perform experiments with evidence in the State's custody. At the hearing on the motion Vincik requested permission to have his firearms expert, using a reconstructed crime scene, perform ballistic testing on the gun and ammunition found at the scene of the murder. Vincik specifically asked for a protective order preventing police officers from being present during the experimentation. He emphasized that during the experimentation his expert would be discussing legal theories and defenses with Vincik and his counsel.

The trial court permitted the ballistic testing but granted the protective order only in part. The court required that the testing be done in the presence of state agents but specifically preserved Vincik's right to discuss the testing with the ballistics expert and Vincik's counsel outside the presence of the state agents. Vincik contends that the trial court erred in allowing the State to observe the "communicative character of the experiments," arguing this forced him to waive his attorney-client privilege.

We grant the trial court wide discretion in ruling on discovery requests and

protective orders. *State v. Grimme,* 338 N.W.2d 142, 144 (Iowa 1983); *State v. Gates,* 306 N.W.2d 720, 725 (Iowa 1981). Vincik has not satisfied his burden to demonstrate that the trial court abused its discretion in granting part but not all of Vincik's request for a protective order. The court's ruling reasonably accommodated Vincik's request for discovery and need to communicate with the expert and his counsel, while also assuring the prosecution that its physical evidence would be safeguarded. The discovery order demonstrates that the court fairly exercised its discretion on this matter involving pretrial discovery.

B. *The State's Failure to Preserve a Partial Fingerprint.* An investigating officer testified that at the crime scene he had observed latent fingerprints on the handgun but was unable to recover any "usable" prints. He described the fingerprints as "basically smudged" and testified the one latent print showing some detail lacked "enough individual ridge characteristics" to qualify it as an identifiable latent print. The investigating officer discarded the partial print, so it was no longer available when defendant requested its production prior to trial.

Defendant assigns as error the trial court's refusal to give a so-called "spoliation" instruction, a direction to the jury that it could infer from the State's failure to preserve the partial print that the evidence would have been adverse to the State.

 There is no merit in Vincik's contention that such an instruction should have been given. We leave largely in the discretion of the trial court the determination whether a jury should be instructed concerning inferences it may draw from missing evidence. *See State v. Langlet,* 283 N.W.2d 330, 335 (Iowa 1979). Moreover, one of the prerequisites for the giving of a spoliation instruction is a showing that the missing evidence would have been admissible at trial. *Id.; see* II J. Wigmore, *Evidence* § 291 (Chadbourn rev. 1972). The testimony concerning these smudged partial fingerprints shows that they were so incomplete as to be useless. They had no evidentiary value whatsoever and would not have been admissible in evidence. The trial court did not abuse its discretion in refusing to give a spoliation instruction.

C. *Exclusion of Proffered Evidence.* Finally Vincik contends that the trial court abused its discretion in excluding certain proffered testimony of one of his expert witnesses, the psychologist who had examined and treated Vincik commencing on July 9, 1984. The witness testified in some detail concerning his opinions about the extent to which Vincik was unable to recall what happened on the day his wife was killed and the reasons for his faulty memory. The trial court did not permit testimony on three matters: what the doctor had been told by other persons when he inquired about Vincik's mood and suicidal tendencies before the incident; how Vincik reacted when he saw another medical doctor point a finger at her temple; and whether he had any indication during his treatment of the patient that Vincik was "deceiving" him.

The admissibility of expert opinion testimony rests largely in the trial court's discretion and we will reverse only on a clear showing of abuse of discretion. *State v. Halstead,* 362 N.W.2d 504, 506 (Iowa 1985). It is ordinarily for the trial court to determine in each case whether expert opinion testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R.Evid. 702.

We conclude that the trial court did not abuse its discretion, based on the record made during trial, in sustaining the prosecution's objections to each of those three subjects of expert testimony.

 The responses the psychologist received to inquiries of Vincik's friends and neighbors constituted hearsay which would be inadmissible unless subject to an exception. Iowa R.Evid. 802. Although expert witnesses may base opinions on facts or data not admissible in evidence if "of a type reasonably relied upon by experts in

the particular field in forming opinions or inferences upon the subject" (Iowa R.Evid. 703), this record does not show that psychologists ordinarily or reasonably rely upon such information.

■ On the matter of defendant's reaction to a finger placed against the temple, the prosecution's timely hearsay objection was sustained and the defendant made no offer of proof from which we can determine the admissibility of the answer Vincik sought to elicit from the witness.

■ Finally, on the question whether the psychologist thought Vincik was deceiving him, we pointed out in *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986), that the ultimate determination of the credibility of a witness is not "a fact in issue" but a matter to be determined solely by the jury. We explained our aversion to admitting expert testimony "that essentially passes on the guilt or innocence of the defendant":

> These inadmissible opinions go a step beyond merely aiding the fact finder in understanding the evidence and actually invade the exclusive domain of the jury, that is, the determination of the guilt or innocence of the accused. Additionally, expert opinions on the truthfulness of a witness should generally be excluded because weighing the truthfulness of a witness is a matter left exclusively to the fact finder.

*Id.* at 95.

In a new trial the record made on these evidentiary matters may cause the trial court to exercise its discretion to admit some of this proffered testimony, or to exclude it based on the cited rules of evidence or other rules such as Iowa Rule of Evidence 403 which requires that the probative value of evidence be balanced against the danger of unfair prejudice, confusion of the jury, or waste of time.

Defendant is entitled to a new trial because the inculpatory statement obtained from him by police officers on July 9, 1984 could not constitutionally be used in evidence against him.

REVERSED AND REMANDED.

All Justices concur except REYNOLDSON, C.J., and SCHULTZ, HARRIS and McGIVERIN, JJ., who dissent.

SCHULTZ, Justice (dissenting).

I do not agree that defendant's confession should be suppressed. Therefore, I dissent from division I of the majority opinion. I concede that we make our own independent evaluation of the totality of the relevant circumstances in reviewing de novo the record concerning constitutional issues. In circumstances such as we have here, where the facts depend upon the credibility of the witnesses, I think we should give some weight to the trial court's finding of fact because the trial court is in a better position to evaluate the credibility of the witnesses.

In ruling on the motion to suppress the confession, the trial court came to a much different decision than did the majority concerning the voluntariness of the statement. The court made the following findings of fact:

> At the police station, the defendant was interviewed by two detectives. He was alert, cooperative, jovial, and coherent. His speech pattern was normal, and he was in no way deceived into making any statements to the police. He was asked if he was hungry and would like any food, however, he declined to eat. He did request soda pop and some was obtained for him by the police officers. Any effect of the valium appears to have worn off and did not affect the Defendant's ability to understand what was going on and the statements made. He did make a confession at the Police Station, and the statements which he made were then dictated to a stenographer by a police officer. The Defendant made changes in the statements as they were being dictated and also made changes in the written statement which was later read back to him. It was and is apparent that he fully understood what he was doing and saying at that time and was

able to make a knowing, voluntary, and intelligent waiver of his rights to remain silent and to proceed without counsel.

. . . .

It should also be noted that the detectives did not interrogate or interview the Defendant for any prolonged period of time, nor were they overbearing or over zealous in their questions and attempts to have the Defendant tell them what happened the day of June 26, 1984. Also, the Court finds that the Defendant did not ask for services of an attorney nor ask to discontinue the questioning or interrogation at any time. He understood he had those rights; however, he chose to waive them.

My review of the evidence produced at the suppression hearing causes me to agree with the trial court. I would not suppress the confession. Additionally, I would not remand the issue concerning a warrantless search to the trial court for further finding of fact. The matter of ineffective assistance of counsel in stipulating that the admissibility of items taken from the bedroom was not contested would be a matter for a postconviction hearing.

REYNOLDSON, C.J., and HARRIS, and McGIVERIN, JJ., join this dissent.