# IN THE COURT OF APPEALS OF IOWA

No. 18-1821
Filed January 21, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**PATRICK RYAN THOMPSON,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Guthrie County, Brad McCall, Judge.

Patrick Thompson appeals his convictions of murder and arson. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Heard by Mullins, P.J., and May and Schumacher, JJ.

**MULLINS, Presiding Judge.**

Patrick Thompson appeals his convictions of murder and arson. He argues the district court erred in failing to issue a spoliation jury instruction and in denying his motion to exclude expert witnesses, the evidence was not sufficient to support the convictions, and trial counsel provided ineffective assistance.

## I. Background Facts and Proceedings

At 12:24 a.m. on May 15, 2017, the Guthrie County Sheriff's Department was alerted to a house fire. Guthrie Center and Panora Fire Departments were dispatched to the scene. The Guthrie Center home belonged to Shirley Exline, who shared the home with her adult son, William Long, a grandchild, P.E., and a great grandchild, S.C.[1] The two children perished in the fire. Patrick Thompson was charged with two counts of murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1)(b) (2017), and arson in the first degree, in violation of Iowa Code sections 712.1 and 712.2(1)(b).[2]

This case involves extended family members of Shirley Exline. Thompson is Shirley's step-grandchild and the step-brother of P.E. Shirley has several children including William Long and James Exline. James is the father of P.E. and N.E., and is the step-father of Thompson and T.D. S.C. is the great-grandchild of Shirley and the granddaughter of an older sister of James.

Thompson was found guilty after a jury trial. He appeals his conviction.

---

[1] Long passed away prior to trial from illness unrelated to the fire.
[2] Thompson initially had other charges pending that were dismissed prior to his conviction.

## II.     Discussion

### A.     Spoliation Instruction

"A spoliation instruction is 'a direction to the jury that it [may] infer from the State's failure to preserve [evidence] that the evidence would have been adverse to the State.'" *State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa 2004) (quoting *State v. Vinick*, 398 N.W.2d 788, 795 (Iowa 1987)).  Thompson argues we should review the record for correction of errors at law.  *Id.* at 630–31.  He relies on our supreme court's statement that a "trial court does not have discretion to refuse a spoliation instruction when the defendant has generated a jury question on the spoliation inference."  *Id.* at 631.  The court has since expanded its discussion, stating that "review of alleged instructional error depends upon the nature of the supposed error."  *Alcala v. Mariott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).  In *Alcala*, the court noted the similarity between a "district court's refusal to give an inference instruction on spoliation" and discovery sanctions.  *Id.*  The court ultimately explained that review of a district court's refusal to provide a spoliation instruction is for abuse of discretion "because that instruction acts as a discovery sanction and discovery sanctions are discretionary."  *Id.*  The elements of a spoliation inference are met when "(1) [the] evidence exists, (2) it is in the possession or under the control of the State, (3) it would have been admissible at trial, and (4) the State intentionally destroyed the evidence."  *Hartsfield*, 681 N.W.2d at 631.

Thompson's argument targets the fourth element, intentional destruction of evidence.  Thompson does not, however, argue the State intentionally destroyed evidence.   He argues the State's failure to properly package evidence is "tantamount to intentional destruction."

"Spoliation involves more than destruction of evidence. Application of the concept requires an intentional act of destruction. Only intentional destruction supports the rationale of the rule that the destruction amounts to an admission by conduct of the weakness of one's case." *State v. Langlet*, 283 N.W.2d 330, 333 (Iowa 1979). "Neither the rationale of the spoliation inference nor any authorities found support submission of the inference [of spoliation] in the case of unintentional destruction." *Id.* at 334. "The issue [of spoliation] should not be submitted to a jury merely upon a claim of spoliation made by a party, but only where substantial evidence exists to support findings" on each of the four elements described above. *Id.* at 335.

Thompson drove a motorcycle and wore a motorcycle suit, helmet, and gloves. The morning after the fire, Thompson directed N.E. to deliver the suit, helmet, and gloves to a friend who lived nearby. When law enforcement officials arrived at the friend's home to collect the evidence, they reported it smelled of gasoline. There is no dispute that the proper collection method would be to place the evidence in a nylon bag. The nylon bags are expensive, and departments do not always have them. In this case, while waiting for a warrant to collect the evidence, which took more than two hours, law enforcement officials attempted to locate a nylon bag and were unable to do so. The items were placed in a paper bag and then placed in the trunk of the collecting officer's car. When the paper bag was delivered to the lab for testing, it was placed in a nylon bag. Later, when the bag was opened, the smell of gasoline had dissipated.

The record reveals that the motorcycle suit, helmet, and gloves were not placed in the preferred nylon bag. However, there were efforts made to obtain a

nylon bag. There is no evidence in the record that the failure to obtain a nylon bag was intentional, and we will not elevate that failure to "tantamount to intentional destruction." Accordingly, the district court did not abuse its discretion in finding the evidence insufficient to generate a jury instruction on the spoliation inference and in refusing to instruct the jury on spoliation.

B. Expert Witnesses

"We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion.'" *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). We examine the district court's determination on admissibility of expert witness testimony to determine whether "the court exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (quoting *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997)). Courts must ask (1) whether expert testimony "'will assist the trier of fact' in understanding 'the evidence or to determine a fact in issue,'" and (2) if the expert "is qualified as an expert by knowledge, skill, experience, training, or education." *Id.* (quoting Iowa R. Evid. 5.702). Iowa courts generally have a "liberal view on the admissibility of expert testimony." *Id.* There is no degree, particular education, or specialty certification required to qualify an expert "as long as the testimony is within the general area of expertise of the witness." *Id.* at 687. "The proponent of the evidence has the burden of demonstrating to the court as a preliminary question of law the witness's qualifications and the reliability of the witness's opinion." *Id.* at 686. Once the court has completed a preliminary analysis of an expert witness's proposed testimony and has deemed it admissible, any remaining argument regarding the expert's qualifications targets the weight of the evidence not its

admissibility.  *Hutchison v. Am. Fam. Mut. Ins. Co.*, 514 N.W.2d 882, 558 (Iowa 1994).

Thompson takes issue with admission of the testimony of Mike Lillebo, David Embleton, Brady Langgaard, Matt Harmann, and Stephanie Yocco.  Lillebo is a Special Agent with the State Fire Marshal's Office and personally participated in the investigation of the fire.  Embleton and Harmann serve as Chiefs for their respective local fire departments, and Langgaard is a firefighter.  All three witnesses responded to the fire scene and participated in the emergency response.  Yocca is a criminalist with the Iowa Division of Criminal Investigation (DCI).  Yocca photographed the scene and participated in lab tests of evidence.

Following a hearing on Thompson's motion to exclude the witnesses, the district court found the arguments targeted at Lillebo "go not to the admissibility of [the] opinions, but to the weight to be given to those opinions by the trier of fact."  Lillebo's testimony was deemed admissible.  The district court also found Yocca was qualified to testify by her training, education, and experience in the DCI Crime Lab.  Her testimony regarding testing evidence for ignitable liquid was deemed admissible because it would "assist the jury in understanding the evidence or determining facts in issue."  Regarding Embleton, Harmann, and Langgaard, the district court noted it had not received information about educational backgrounds of the witnesses.  It did, however, note that all three witnesses had personally observed the fire and that testimony would be admissible if relevant.  The district court declined to rule on the three remaining witnesses as experts.

On our review of the record, the testimony of Embleton, Harmann, and Langgard focused on their history and experience as firefighters and their personal

experiences with the Exline home fire. It does not appear that they testified as expert witnesses. We find no abuse of discretion in allowing the firefighters to testify as lay witnesses.

The district court made the following findings regarding Lillebo's qualifications:

> Lillebo, who has some post-high school education but no degree, began his career in law enforcement as a Military Policeman in the United States Army. From 1993 to 2000 Lillebo was with the Iowa State Patrol, initially as a State Trooper and then as a Trooper Pilot. In 1993 Lillebo went to work with the State Fire Marshal's Office. Since then he has acted as both a Fire Inspector and an Arson Investigator. He has worked continuously as an Arson Investigator since 2010.
> Lillebo first received training in fire origin and cause investigations in 2003. He also acknowledged familiarity with [National Fire Protection Association (NFPA)] guidelines and standards and confirmed those guidelines and standards were followed in the investigation of the fire at issue in this case. Lillebo testified he has conducted more than 250 fire origin and cause investigations in his career.

(Footnotes omitted.) Lillebo's curriculum vitae was also submitted to the court, revealing extensive experience in the years he has served the State Fire Marshal. Although Lillebo does not have a particular degree related to science, he has years of experience investigating fires and has participated in several trainings related to fire and arson investigation. Lillebo testified his opinions were based on the totality of the circumstances of the fire and that he and other investigators utilized NFPA guidelines and the scientific method to investigate the fire.

The district court made the following findings related to the qualifications of Yocca.

> Yocca has a BS in forensic science with minors in chemistry and biology as well as a Master's Degree in forensic science. She has been employed at the DCI Crime Lab for about three years. One of

> her primary responsibilities at the lab is to test various items in connection with fire scene investigations to determine the presence of ignitable fluids. She estimates she has conducted tests on materials from more than 300 fires.
>
> It is clear Yocca has the qualifications, based upon her experience, training and education, to offer expert opinions related to her testing of the various items for the presence of ignitable fluids. Furthermore, based on the deposition record before the Court it does not appear her opinions regarding the reason she failed to find ignitable fluids go beyond the scope of her experience, training and education. Such testimony will assist the jury in understanding the evidence or determining facts in issue.

Yocca has extensive formal education in forensic science. She also has three years of experience in testing fire evidence for ignitable fluids, the very topic on which she testified.

Experts Lillebo and Yocca both presented evidence of education, training, and experience in the areas of fire investigation related directly to their testimony. The issues Thompson raised regarding these experts relate to the weight of the evidence and not to admissibility. *See id.* On our review of the record, we find the district court did not abuse its discretion in denying the motion to exclude the expert witnesses.

C. Sufficiency of the Evidence

"Challenges to sufficiency of the evidence are reviewed for correction of errors at law." *State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa

2012) (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 639–40 (Iowa 2002)).  On appellate review, "We will consider all the evidence presented, not just the inculpatory evidence."  *Id.*

Thompson argues (1) the evidence fails to show he started the fire, and (2) that the fire was intentionally started.  Thompson's claims target his arson conviction.  Arson is defined as:

> Causing a fire or explosion, or placing any burning or combustible material, or any incendiary or explosive device or material, in or near any property with the intent to destroy or damage such property, or with the knowledge that such property will probably be destroyed or damaged, . . . whether or not any such property is actually destroyed or damaged.

Iowa Code § 712.1(1).  "Arson is arson in the first degree when the presence of one or more persons can be reasonably anticipated in or near the property which is the subject of the arson, or the arson results in the death of a fire fighter, whether paid or volunteer."  *Id.* § 712.2(1).

The opinions of expert witnesses conflicted regarding the origin and cause of the fire.  Lillebo opined the fire began on the exterior of the home, on the south porch.  Lillebo testified the cause of the fire was "open flame to an ignitable liquid, incendiary fire."  Lillebo also testified the investigation ruled out an electrical event caused by wiring and appliances on the porch, and the burned vehicles that were parked outside the garage.  He also testified the fire was unusual in that it was widespread at the base, rather than developing "up and out" as "normal" flames develop.

The defense expert also opined the fire originated on the south porch.  The defense expert was unable to identify a cause of the fire, but testified one possibility

was extension cords used to power appliances located on the porch. Neighbors who called the police the night of the fire noted the fire began on the outside of the home, on the south side of the porch.

The homeowner, Shirley, testified that during the fire, she saw someone fleeing from her home. She initially reported the person was short and the body type physically resembled N.E. When deposed, Shirley said it was hard to tell what the person looked like because it was dark outside and the room was full of smoke. She also said the person was big and tall. At trial, Shirley testified she could not identify the person she saw that night.

The record shows that the Iowa Department of Human Services was involved with the family, investigating allegations of child sex abuse against both James and N.E. Cell phone records reveal that James and his wife, Christene, were angry with Shirley. Those records also show James and Thompson discussed taking action to disable the vehicles that were available to Shirley, to prevent her from appearing for the next juvenile court hearing in the sex-abuse case set to occur on May 21, 2017. James stated he could not disable the cars himself nor could he transport Thompson to Shirley's home because he needed an alibi. Thompson's text messages show he volunteered that he could drive his motorcycle to Shirley's home wearing a helmet, park a few blocks away, and walk to the home. Christene also exchanged text messages with Thompson, expressing anger with the biological mother of P.E. The conversation included the following exchange:

> Thompson: Kill all the bitches with their head games.
> Christene: Might.

Thompson: Yeah. It's the killing that entices me. Sounds so good sometimes.

Christene: If it wasn't against the law and I didn't let them win, it might be good.

Thompson: Yeah, it might.

The day before the fire, Thompson and James had the following text message exchange:

James: You guys still coming today?

Thompson: Yep

James: Okay. [Christene] doesn't think you guys will, so I guess she will be surprised.

Thompson: Yeah, we're going to run [his girlfriend] home around noon or one. Then come there.

James: You bringing the bike still?

James: Is it still planned?

Thompson: Yep.

Shirley testified that when James learned of the fire, he and Christene came into town and stood a few blocks away from the scene. Shirley tried to speak to James, but he would not interact with her. She also testified Christene laughed while Shirley tried to speak to James.

Thompson and N.E. spent the evening of May 14, 2017 (hours before the fire), at the home of James and Christene to celebrate Mother's Day. Thompson initially told police he left at 10:30 or 11:00 p.m. and returned to his home in Nevada. N.E. testified Thompson arrived at their shared apartment between 3:00 and 4:00 a.m. Video evidence from traffic cameras on the route identified by Thompson shows a motorcycle on the highway around 2:30 a.m., which would corroborate N.E.'s timeline of the evening. T.D., a half-sibling of Thompson and step-sibling of N.E., testified she saw N.E. as he drove home that night. T.D. testified that when she arrived at the home of James and Christene, Thompson

was also present and left around 10:40 p.m. Cell phone records reveal that Thompson did not call his girlfriend to say goodnight until after 3:00 a.m.

Testimony at trial shows that the morning after the fire, Thompson asked N.E. to deliver his motorcycle suit, helmet, and gloves to a neighbor. Thompson told the investigating officer he had a motorcycle helmet and a jacket, but no special riding gear. When he was interviewed, N.E. told police Thompson did have a motorcycle suit, and that he delivered it to the neighbor. When police arrived to collect the motorcycle suit, helmet, and gloves from the neighbor, the items allegedly had a strong odor of gasoline. But when tested, none of the items had traces of gasoline.

Thompson also told investigating officers he did not have saddlebags attached to his motorcycle. Testimony from Thompson's co-workers revealed he did have saddlebags, that they were removed from the motorcycle after the fire, and that they had been left on the workplace premises, in an office and under a desk. However, testimony also showed Thompson and all other employees had access to the office, routinely left personal items in the office, and used the desk to gain computer access. There was also a blowtorch that went missing from Thompson's employer around the date of the fire. But, another employee was terminated following the fire for allegedly removing company property from the premises.

From the evidence presented, a rational factfinder could make a number of findings. Based on expert testimony about the fire itself, a rational factfinder could find the fire's origin was on the south porch of the home and was not due to faulty wiring, electronics, or an act of nature like lightning. From that same testimony, a

rational factfinder could find the cause of the fire was incendiary. A rational factfinder could also find there was a significant amount of animosity between Shirley and James, who with his wife and stepchildren, were critical of and at least verbally hostile toward Shirley. A rational factfinder could further find that Thompson's whereabouts from just before 11:00 p.m. on May 14 to between 3:00 and 4:00 a.m. on May 15, 2017 are unknown. Moreover, a rational factfinder could find Thompson took steps to conceal certain relevant possessions from investigators including his motorcycle suit, helmet, gloves, and saddlebags. On our review of the record, we conclude there is sufficient evidence from which a rational factfinder could find Thompson guilty beyond a reasonable doubt of arson in the first degree. *See Hansen*, 750 N.W.2d at 112.

D. Ineffective Assistance

Claims of ineffective assistance of counsel are reviewed de novo. *State v. Kuhse*, 937 N.W.2d 622, 627 (Iowa 2020). Ineffective-assistance claims related to judgments and sentences entered prior to July 1, 2019 may be considered on direct appeal. *State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019). "Thus, we will decide whether the appellate record is adequate to determine the claim. If not, the claim will be preserved for postconviction relief." *Kuhse*, 937 N.W.2d at 627 (quoting *State v. Brothern*, 832 N.W.2d 187 192 (Iowa 2013)).

Thompson argues generally that if any of his other claims on appeal fail, they should be reviewed through the lens of ineffective assistance of counsel. The State responded to the claim in a footnote only. The State argues the generality of Thompson's claim and his failure to identify how trial counsel was ineffective render the claim waived pursuant to Iowa Rule of Appellate Procedure

6.903(2)(g)(3). The rule provides an appellant's brief must state "the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record in accordance with rule 6.904(4). Failure to cite authority in support of an issue may be deemed waiver of that issue." Iowa R. App. R. 6.903(2)(g)(3). The failure to cite authority has rendered the development of the ineffective-assistance claim insufficient to allow its consideration. In this situation, we "should not consider that claim, but [we] should not outright reject it." *State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018). Instead, we "must preserve it for a postconviction-relief proceeding." *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

Thompson's brief makes broad statements about the legal framework supporting ineffective-assistance claims but fails to identify any alleged error on behalf of his trial counsel. Accordingly, we do not consider that claim, but preserve it for a possible postconviction-relief proceeding.

## III. Conclusion

Thompson has failed to show there was an intentional destruction of evidence to necessitate a spoliation instruction. Because the expert witnesses were qualified in accordance with the Iowa Rules of Evidence, the district court did not abuse its discretion in denying Thompson's motion to exclude. Following our review of the record, we conclude a rational factfinder could find Thompson guilty beyond a reasonable doubt of arson in the first degree. Thompson's ineffective-assistance-of-counsel claim is preserved for a possible postconviction-relief proceeding.

**AFFIRMED.**