167 So.2d 858 (1964)
Joe REDDISH, Appellant,
v.
The STATE of Florida, Appellee.
No. 31796.
Supreme Court of Florida.
July 22, 1964.
On Petition for Modification October 7, 1964.
*860 Scruggs & Carmichael, Gainesville, for appellant.
James W. Kynes, Atty. Gen., and James G. Mahorner, Asst. Atty. Gen., for appellee.
THORNAL, Justice.
Appellant Joe Reddish seeks reversal of a verdict and judgment finding him guilty of murder in the first degree with an ensuing death sentence.
Reversal is sought on the grounds that two confessions allowed into evidence were not voluntarily obtained; that certain pictures should not have been permitted in evidence and that testimony regarding the collateral offense was inadmissible.
Reddish was convicted of the murder of Deputy Sheriff Harold P. Croft. The homicide was committed when Croft was in the act of serving upon Reddish a warrant charging him with malicious shooting into the dwelling of one Ira Green. For some months prior to the homicide Reddish had been having an affair with Green's wife, Velma. The clandestine affair had reached the point where Velma had discussed divorcing her husband Ira so that she could marry Joe Reddish. At about 9:30 P.M., May 22, 1961, Joe proceeded to Ira's house and fired one or more shotgun blasts through the front door. Sheriff Whitehead obtained a warrant for Joe's arrest charging him with the shooting into the Green dwelling. While attempting service of the warrant, Deputy Sheriff Croft was killed at the Reddish home around 9:30 A.M., May 23, 1961. One Ronald Jackson, a civilian who accompanied Croft, was also killed. Reddish thereupon obtained Croft's .38 calibre pistol and attempted suicide by shooting himself in the chest. He was taken to a hospital in critical condition at 10:30 A.M., May 23. At about 10:15 P.M., the same day the state attorney obtained from Reddish a confession under circumstances which we shall later relate. At about 11:15 A.M. the following morning, May 24, 1961, the state attorney obtained a second confession. Both of these statements were allowed in evidence. In the course of the trial, the judge also permitted into evidence two pictures of the bodies of the dead men which were made in a Lake City morgue, a number of miles from the place of the shooting near Starke. The judge also permitted testimony regarding the occurrence at the Green home the night before the shooting. Reddish was tried for the murder of Croft. The jury found him guilty of first degree murder. There was no mercy recommendation. The mandatory death sentence followed. For reasons which we shall discuss, reversal of the conviction is now sought.
The trial judge permitted testimony regarding the shooting into the Green residence the night before the homicide. The appellant contends that this testimony was inadmissible because it points to the commission of an independent crime. The judge committed no error in allowing this testimony to go to the jury. The rule is that relevant evidence will not be excluded merely *861 because it relates to facts which would support proof of the commission of a separate collateral crime. The test of admissibility is relevancy. In the instant case the evidence was admissible to establish the intent of the accused, the knowledge that the deputy had reason to arrest him, as well as his purpose in attempting to prevent the arrest. The questioned testimony was admissible under the rule announced in Williams v. State, (Fla. 1959) 110 So.2d 654.
Our major concern develops from the ruling of the trial judge that the two confessions were given freely and voluntarily. It will be recalled that Reddish attempted suicide immediately after the homicide for which he was convicted. The self-inflicted wound was in the immediate vicinity of the man's heart but proved to be non-lethal. The homicide was committed sometime around 9:30 A.M., May 23, 1961. Reddish was admitted to the Bradford County Hospital in Starke at 10:30 A.M. the same morning. From that point various medications were administered to control infection, to coagulate his blood, to supply intravenous nutrients and to relieve pain. Our primary concern derives from the narcotic effect of the analgesic drugs administered to relieve the severe pain which the appellant experienced during the critical period. In addition to codeine the primary analgesic was a narcotic known as demerol. We have extracted from the hospital chart in evidence certain significant facts relating the dosages of demerol to the obtaining of the confession. Eliminating entries regarding intravenous feedings, coagulants, and antiseptics, we show in the footnote[1] the chart entries describing the narcotic dosages and the times given. These entries also relate the time significance of the narcotic dosages to the obtaining of the confessions.
In addition to the narcotic medication, other factors should be considered. Of major importance was the physical condition of the appellant at the time the confessions were obtained. The man was admitted to the hospital at 10:30 A.M. May 23, suffering from an almost fatal self-inflicted pistol wound. There was profuse bleeding. During the day he was given three transfusions of whole blood, totaling 1,500 cc. Admittedly, this severe loss of blood produced weakness and a sort of stupor. He was in a condition of great shock which a doctor stated could be "a deadly thing in cases of this kind". The shock was so severe that it was several hours before he could even begin to talk rationally. The medical profession seems to be lacking in complete accord regarding the influence of the drug demerol. It appears to be in usage as a substitute for morphine, perhaps somewhat less likely to produce psychic effects but nonetheless in a class with the opiates. See: Bonica, The Management of Pain, page 584; Griffith v. Rhay (C.A.9) 282 F.2d 711. In the instant case only one doctor testified. The record description of the full effects of the drug leaves much to be desired insofar as it related *862 to the impact of the accumulated dosages on the man's mental capacity to give a free and voluntary confession that could send him to the electric chair, within constitutional standards. It was the state's burden to prove that the confession was freely and voluntarily obtained. It seems to be agreed that the drug is a relaxant. It directly affects the sensatory system and produces drowsiness or sleep. For a discussion of its narcotic effects see Griffith v. Rhay, supra. It relieves anxiety, causes one to be indifferent to things going on around him and produces a cloudiness of mind. It is defined as follows by Schmidt's, Attorneys Dictionary of Medicine:
"The trade-marked name of a medicine used chiefly to allay pain. In this respect it approaches the effectiveness of morphine. It is also used as a sedative, in preparing a patient for surgery, in obstetrics, etc."
Regarding the first confession, the doctor last saw the man about 7:00 P.M., May 23, prior to the interrogation by the state attorney at 10:15 P.M. the same night. Despite the fact that he expressed the opinion that Reddish was "rational" at the critical time (10:15 P.M.) we cannot overlook the following colloquy between defense counsel and the physician:
"Q. And, Doctor, that was the condition of the man and without seeing him from seven until ten, are you going to get on this witness stand and state that he was completely lucid at the time that the State's Attorney talked to him at ten o'clock?"
"A. Sir, of course, I wasn't there at that time and I would certainly be no judge as to that and I did not question him at that time. The State's Attorney did and I think that he would know."
"Q. So you leave it to the State's Attorney?"
"A. I would have to." (Emphasis added)
Another significant fact appears from the chart which we have transcribed in the footnote. It shows that, after numerous dosages of the drug, the appellant was given a dose of codeine at 8:00 P.M., and a dose of demerol at 9:40 P.M. At 10.00 P.M. he was asleep when the state attorney entered his hospital room. He was aroused at 10:15 P.M., which is the time shown in the transcript for the beginning of the interrogation.
Similarly, with reference to the second confession taken at 11:15 A.M., May 24, there are added significant factors which cannot be ignored. The doctor last saw Reddish at 9:30 A.M., May 24. He formed the opinion that the man would be capable of understanding and intelligently answering life or death questions at 11:15 A.M. Yet, on cross-examination by defense counsel, the same doctor frankly conceded that a man who had taken the same amount of the same narcotics would not be in a fit condition to operate an automobile. We are not accepting this as a standard to measure the admissibility of a confession. We mention the fact in passing, however, as an indication of the man's condition when he was interrogated.
It should be noted further that these statements were in the form of questions propounded by the state attorney and answered by the appellant under the circumstances above epitomized. We do not have here a statement written and signed by the accused. So far as the record reveals, these statements were not resubmitted to the appellant at any later date for his confirmation or rejection. The state attorney appeared in the man's hospital room with a court reporter who transcribed the questions and answers.
We recognize that, generally, a confession obtained while under the influence of narcotics is governed by much the same rule as a confession made under the influence of intoxicating liquors. Ordinarily, the cases indicate that the effect of *863 narcotics relates generally to the credibility to be given the confession, rather than its admissibility. 23 C.J.S. Criminal Law § 828, page 228 and cases cited. However, we are here confronted with the problem of determining as a mixed question of law and fact whether these confessions were initially admissible as having been freely and voluntarily given. Brown v. State, 135 Fla. 30, 184 So. 518; Williams v. State, 156 Fla. 300, 22 So.2d 821. In this regard our concern is not so much whether the confessions contained a true and accurate revelation of the appellant's connection with the crime. Rather, we must decide whether at the time the critical statements were made the mind of the accused was sufficiently clear and unhampered by the combination of his physical condition and the impact of the narcotic medication that it can be said that he freely and voluntarily related his connection with the crime. This is necessary to avoid the constitutional prohibition that one shall not be compelled in a criminal case to testify against himself. Section 12, Declaration of Rights, Florida Constitution, F.S.A.; Williams v. State, supra. It is clear that a conviction which results from either physical or psychological coercion cannot be permitted to stand. Whether the confession is true is not the determining element. It is the method used to obtain the statement that must be measured by constitutional standards. Under our accusatorial system the state cannot establish guilt by statements obtained by either physical or psychological coercion exerted against the accused himself. If for any reason a suspect is physically or mentally incapacitated to exercise a free will or to fully appreciate the significance of his admissions, his self-condemning statements should not be employed against him. Despite the fact that here, as in many other cases, corroborating evidence points clearly to the guilt of the accused, the impermissibly extracted confession will require a reversal if it is allowed as a link in the chain of evidence. Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760; Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770.
A careful and thorough study of this record, in the light of our obligation under Section 924.32, Florida Statutes, F.S.A., has brought us to the conclusion that these confessions should not be permitted to stand as evidence against this appellant. The totality of all the circumstances, such as the man's physical condition, in combination with the impact of the narcotics, as well as the lack of clear-cut testimony regarding his mental condition at the time he gave the statements, leads us to conclude that these confessions were not obtained in a manner consistent with constitutional standards against compulsive self-incrimination. Their allowance into evidence was, therefore, error.
The state placed in evidence photographs of the dead bodies of Deputy Croft and Mr. Jackson. These pictures were made after the bodies have been removed to a morgue many miles from the scene of the homicides. We have consistently held that photographs which have potentials for unduly influencing a jury should be admitted only if they have some relevancy to the facts in issue. Ordinarily, photographs normally classed as gruesome should not be admitted if they were made after the bodies have been removed from the scene unless they have some particular relevance, as was the situation in Leach and Smith v. State, Fla., 132 So.2d 329. While the photographs (in the instant case) were not unusually gruesome, when measured by standards of others which have been allowed into evidence, we nevertheless fail to find any justifiable relevancy for their admissibility in the instant case. The cause of death had been clearly established and there was no fact or circumstance in issue which necessitated or justified the introduction of the photographs of the dead bodies. Mardorff v. State, 143 Fla. 64, 196 So. 625; Dyken v. State, Fla., 89 So.2d 866.
As above indicated, in view of our statutory obligation under Section 924.32, Florida *864 Statutes, F.S.A., we have concluded that this conviction must be reversed and the cause retried with the elimination of the erroneous aspects which we have discussed.
It is so ordered.
DREW, C.J., and THOMAS, ROBERTS, O'CONNELL and CALDWELL, JJ., concur.

ON PETITION FOR MODIFICATION
PER CURIAM.
The appellee has requested that we modify our original opinion by eliminating therefrom, the following statement:
"It was the state's burden to prove that the confession was freely and voluntarily obtained."
The holdings vary in different jurisdictions. Florida has long adhered to the rule that preliminary to the introduction of an extra-judicial confession it is the state's burden to go forward with the evidence to establish its admissibility. This includes the burden to make a prima facie showing that the confession was voluntarily given. When the state has accomplished this, an accused who denies the voluntariness of the confession must then go forward with evidence to support his position. The trial judge then rules on the basis of all of the evidence. Davis v. State, 90 Fla. 317, 105 So. 843; Nickels v. State, 90 Fla. 659, 106 So. 479; Cawthon v. State, 118 Fla. 394, 159 So. 366; Bates v. State, 78 Fla. 672, 84 So. 373; Welsh v. State, 122 Fla. 83, 164 So. 835; Whitten v. State, 86 Fla. 111, 97 So. 496; Sims v. State, 59 Fla. 38, 52 So. 198; Louette v. State, 152 Fla. 495, 12 So.2d 168.
The divergent rules of the various courts are revealed by the following: Wharton, Criminal Evidence, 12th Ed., Section 352; Commonwealth v. Dascalakis, 243 Mass. 519, 137 N.E. 879, 38 A.L.R. 113, and McLemore v. State, 181 Ga. 462, 182 S.E. 618, 102 A.L.R. 634.
The respondent does not otherwise question our original opinion. The petition for modification is, therefore, denied.
It is so ordered.
DREW, C.J., and THOMAS, ROBERTS, THORNAL, O'CONNELL and CALDWELL, JJ., concur.
NOTES
[1] Hospital chart.

May 23, 1961:

 10:30 A.M. Admitted to hospital
 11:00 A.M. 100 mg demerol
 1:00 P.M. 100 mg demerol
 3:00 P.M. 100 mg demerol
 5:00 P.M. 100 mg demerol
 7:00 P.M. 100 mg demerol
 8:00 P.M. Codeine
 9:40 P.M. demerol
 10:00 P.M. Apparently asleep

Mr. Duncan [state attorney] here
10:15 P.M. Aroused
[At this point the first confession was obtained by the State Attorney propounding questions and Reddish answering. The questions and answers were taken down and transcribed by a court reporter.]
11:00 P.M. 50 mg demerol
May 24, 1961:

 12:00 Midnight 100 mg demerol
 3:00 A.M. 4 cc agua mephyton
 3:30 A.M. Codeine
 4:00 A.M. 100 mg demerol
 6:00 A.M. Poor night
 7:00 A.M. 100 mg demerol
 10:00 A.M. 25 mg phenegran [antiemetic]
 11:00 A.M. Mr. Duncan, lawyer.

[At this point the second confession was obtained in a manner similar to the first.]
Brackets and emphasis added.