Steven W. MITCHELL, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Steven W. Mitchell, Appellant
(Defendant),

v.

The State of Wyoming, Appellee
(Plaintiff).

Nos. 97–241, 97–242.

Supreme Court of Wyoming.

June 24, 1999.

Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Walter Eggers, Assistant Public Defender; and T. Alan Elrod, Assistant Public Defender. Argument by Mr. Elrod, Representing Appellant:

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Barbara L. Boyer, Senior Assistant Attorney General. Argument by Ms. Boyer, Representing Appellee:

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

LEHMAN, Chief Justice.

Appellant Steven Mitchell, convicted of first degree murder and two counts of attempted first degree murder, appeals his judgment and sentence. Mitchell raises issues of *Miranda* violations, improper admission of involuntary statements, improper joinder of trial, prosecutorial misconduct, and error in the ordered forfeiture of his truck. We affirm the judgment and modify the sentence to strike the forfeiture portion of the order.

### ISSUES

Mitchell presents the following issues for review:

I. Did the District Court err when it denied the Appellant's motions to suppress the Appellant's inculpatory statements to law enforcement?

II. Was the District Court's order granting the prosecution's motion for joint trial erroneous?

III. Did the Prosecution violate the Appellant's right to a fair trial during its rebuttal closing argument?

IV. Did the District Court impose an illegal sentence when it ordered the forfeiture of the Appellant's truck to pay public defender fees?

The State rephrases the issues:

I. The District Court properly denied Appellant's motion to suppress the statements he made to law enforcement.

II. The District Court did not abuse its discretion when it granted the prosecutor's motion for joint trial.

III. In closing argument, counsel for the State did not improperly assert his personal beliefs to the jury.

IV. The District Court properly ordered that the proceeds of a sale of Appellant's truck may be applied as reimbursement

---

* Retired November 2, 1998.

for fees owed to the public defender's office.

## FACTS

Around 2:00 a.m. on October 14, 1996, Mike Norton stopped by Tawnya "T" Sidwell's trailer. Norton and Pam Turner, Sidwell's roommate, talked in the living room, while Sidwell wrote a letter in her bedroom. Norton and Turner left the house twice during the next couple hours. During the first of these outings, around 3:30 a.m., they spotted Mitchell and invited him to go to the Sidwell residence. Mitchell arrived shortly after Norton and Turner returned. Around 4:00 a.m., Sidwell stated she was going to bed, and Norton and Turner left the residence once more. Mitchell remained in the trailer. Fifteen to twenty minutes later, Norton and Turner returned, finding Mitchell gone and Sidwell dead from a gunshot wound to the cheek area. Hysterical, believing Sidwell had shot herself, Turner ran to a neighbor's house and phoned Mitchell at his home to inform him of Sidwell's death. Norton, too, immediately left. While driving out of the trailer park, however, Norton spotted a police car, flashed his headlights at the officer, and led the officer back to the residence.

The police interviewed Norton and Turner, and then sought Mitchell for questioning. In an attempt to locate Mitchell, Lieutenant Mecham drove to the Mitchell home. While outside, Mecham telephoned the Mitchell residence and spoke with Mitchell's mother, advising her that there had been a shooting and the police wanted to talk with her son. Though several officers were at the residence, only Officers Mecham and Bingham went inside. Almost immediately, Mecham realized someone was standing in the hallway. As he peeked around the wall into the hallway, Mitchell shot him in the neck with a shotgun. Officer Bingham returned fire, shooting Mitchell in the hand.

After the officers removed Mecham, only Mitchell remained inside. The Special Response Team (SRT) then responded and fired tear gas into the house. Proving unsuccessful in removing Mitchell, several officers then entered the home. Unknown to the officers, Mitchell had crawled into the attic; and, when Mitchell saw Officer Hyer crawling down the hallway, he again fired, shooting Officer Hyer in the arm. Mitchell remained barricaded in the attic as the SRT continued to tear gas the house. The officers eventually decided to send an entry team into the attic from the outside by cutting a hole near the roof at each end of the house. Mitchell finally surrendered and was placed under arrest.

Mitchell was transported to the hospital for treatment of the gunshot wound to his hand. Upon Mitchell's arrival, Detective Haskell informed Mitchell of his rights by reading from a *Miranda* card. Mitchell stated that he understood his rights, but the detective did not question him at that time. Approximately eleven hours later, while still in the hospital, Special Agent Rumpf interviewed Mitchell without re-advising him of the *Miranda* warnings. When asked, Mitchell told Agent Rumpf that he remembered another officer advising him of his rights, he understood those rights, and he knew they still applied. Mitchell agreed to answer some of Agent Rumpf's questions. Prior to trial, Mitchell filed suppression motions, claiming his statements were involuntary and that the police failed to properly advise him of his *Miranda* rights. After a hearing, the trial court denied the suppression motions.

## SUPPRESSION MOTIONS

### Standard of Review

To comply with *Miranda*, law enforcement must advise an accused of his rights before any of the accused's statements, made during custodial interrogation, can be used against the accused at trial. *Kolb v. State*, 930 P.2d 1238, 1243 (Wyo. 1996); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Failure to comply with these procedural safeguards requires the court to suppress such statements. We review the record to determine whether the trial court could conclude, given the totality of the circumstances, that the police sufficiently followed *Miranda*. *Kolb*, 930 P.2d at 1240.

Moreover, even when *Miranda* has been complied with, the United States Constitution, amendments V and XIV, as well as the Wyoming Constitution, art. 1, §§ 6 and 11, require admissions and statements to be voluntary. *Doyle v. State*, 954 P.2d 969, 971–72 (Wyo.1998); *State v. Evans*, 944 P.2d 1120, 1124 (Wyo.1997). To be voluntary, the defendant's statements must result from "free and deliberate choice rather than intimidation, coercion, or deception." *Madrid v. State*, 910 P.2d 1340, 1344 (Wyo.1996). Because we presume a defendant's statements to be involuntary, the burden rests on the State to show, by a preponderance of the evidence, that the defendant's statements were voluntary. *Evans*, 944 P.2d at 1126–27. Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements. *Id.* at 1126. If such statements resulted from coercion, then the statements are inadmissible at trial for any purpose because their validity is suspect. *Id.* at 1125.

Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo. *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985); *Doyle*, 954 P.2d at 972; *Simmers v. State*, 943 P.2d 1189, 1194 (Wyo.1997); *Evans*, 944 P.2d at 1124. On review, however, we will not disturb the trial court's findings of fact unless clearly erroneous. *Id.* We look to the totality of the circumstances to determine if the defendant's statements were voluntary. *Vigil v. State*, 859 P.2d 659, 664 (Wyo.1993).

### Miranda

The police read Mitchell the *Miranda* warnings upon his arrival at the hospital around 11:00 a.m. Detective Haskell testified that he administered the required warnings by reading from his *"Miranda* card." After each point in the *Miranda* warnings, Officer Haskell specifically asked Mitchell if he understood the rights explained, to which Mitchell always replied "yes." The attending nurse heard Haskell advise Mitchell of his rights and heard Mitchell respond that he understood. Mitchell was alert and coherent, and responded properly to directions.

Mitchell was interviewed later that same day at 10:00 p.m. by Agent Rumpf. Questioning occurred several hours after Mitchell underwent surgery on his hand. Testimony revealed that Mitchell was alert, responsive, aware of his surroundings, and not on pain medication. Although Mitchell had been offered pain medication several times during the day, he had refused such offers. Before questioning, Agent Rumpf asked Mitchell if he recalled another officer earlier reading him his rights. When Mitchell hesitated, Agent Rumpf began summarizing the *Miranda* warnings, to which Mitchell started nodding his head, yes, repeatedly. When asked if he would like to answer some of Agent Rumpf's questions, Mitchell responded, "[y]es, some," indicating he would answer some questions, but not others.

In response to Agent Rumpf's question of what happened, Mitchell explained how Turner phoned to tell him about Sidwell's death. Mitchell described picking up Turner and taking her to the park that morning, with Turner talking about how Sidwell's apparent suicide upset her. The narrative continued with Mitchell recounting how his mother told him the police wanted to talk with him, how he loaded his shotgun and armed himself. When asked by Agent Rumpf about the police presence, Mitchell responded that he figured they were probably there to talk to him about a death. Next, Mitchell described how he heard his mother crying at the front door and how he shot Mecham because he perceived Mecham as a threat. Mitchell further explained his reaction to the police as "[f]rom the past, I wouldn't doubt they would kill me" as well as his dislike for Lieutenant Mecham, since Mecham was responsible for "tearing my family apart." The interview also elicited Mitchell's description of his relationship with Sidwell as "best of friends." Mitchell explained the events of the night and early morning of Sidwell's death. Mitchell did not admit to shooting Sidwell.

Mitchell's claim that the procedural safeguards of *Miranda* were not met is without merit. The record does not demonstrate that Mitchell lacked the capacity to compre-

hend the warnings. While it would have been advisable, and a safer procedure, for Agent Rumpf to fully re-advise Mitchell of the *Miranda* warnings, Mitchell acknowledged that he understood his rights, knew that they still applied, and agreed to talk to Agent Rumpf. The trial court correctly denied Mitchell's suppression motions, viewing the combination of the initial reading of the *Miranda* warnings and the partially complete re-advisement sufficient, along with Mitchell's acknowledgment that he remembered and understood the prior warning.

█ Even if we assume that the second reminder of *Miranda* warnings was not sufficient, under the facts of this case the police were not required to re-advise Mitchell. The mere passage of time does not compromise a *Miranda* warning, and courts have generally rejected a per se rule requiring automatic re-advisement following a time delay. *U.S. v. Andaverde*, 64 F.3d 1305, 1312–13 (9th Cir. 1995), cert. denied 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996); *U.S. ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977), cert. denied 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978). Several courts have upheld the sufficiency of *Miranda* warnings where several hours have elapsed between the reading of the warning and the interview or confession. *U.S. v. Frankson*, 83 F.3d 79, 83 (4th Cir.1996); *State v. Brewer*, 48 Ohio St.3d 50, 549 N.E.2d 491, 499–501 (1990); *U.S. v. Diaz*, 814 F.2d 454, 460 n. 6 (7th Cir.), cert. denied 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *U.S. ex rel. Patton v. Thieret*, 791 F.2d 543, 547–48 (7th Cir.), cert. denied 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir.), cert. denied 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985); *Bush v. State*, 461 So.2d 936, 938–39 (Fla. 1984), cert. denied 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986); *U.S. v. Osterburg*, 423 F.2d 704 (9th Cir.), cert. denied 399 U.S. 914, 90 S.Ct. 2216, 26 L.Ed.2d 571 (1970); *Maguire v. U.S.*, 396 F.2d 327, 331 (9th Cir.1968), cert. denied 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969). There is no evidence in the record of emotional or intellectual immaturity that would detract from the efficacy of the original *Miranda* warnings. Because there is no indication

that Mitchell either was unaware or did not understand his rights, further warnings were not required before questioning. *Yung v. State*, 906 P.2d 1028, 1034 (Wyo.1995). Accordingly, the trial court properly denied Mitchell's *Miranda* claim.

### Voluntariness of Statements

The State established voluntariness by presenting specific and detailed evidence, such as testimony of Agent Rumpf and the other officers describing the circumstances of Mitchell's interview. *Evans*, 944 P.2d at 1127. The four police officers present during the interview testified that the questioning was friendly; the police made no promises or threats; and intimidation, coercion, or deception were not present. Mitchell was relaxed, coherent, and not in any physical or mental distress. Testimony revealed that although Mitchell was offered pain medication several times, he refused such offers and had not received any medication for at least six hours prior to the interview.

█ In his brief, Mitchell argues his situation is similar to *State v. Vincik*, 398 N.W.2d 788 (Iowa 1987) and *Reddish v. State*, 167 So.2d 858 (Fla.1964). Both the *Vincik* and the *Reddish* courts found the defendants' statements to be involuntary. In *Vincik*, the defendant was recovering from brain and eye surgery and was under the influence of drugs, including phenobarbital and dilantin. *Id.* at 790–93. The police transported Vincik from the Veterans Administration Hospital to the police station for interrogation. During the hearing on voluntariness, a neurosurgeon testified that the "type of brain damage suffered by Vincik frequently results in a lack of inhibition and a lack of appropriate response to questions and situations." *Id.* at 791. Moreover, the details regarding the interview and the voluntariness of Vincik's statements were disputed by the parties. *Id.* In *Reddish*, the defendant was in critical condition after an almost fatal self-inflicted gunshot wound to the chest. *Reddish*, 167 So.2d at 861. Following surgery, the defendant was given demerol every two hours and received a dose half an hour prior to his confession. *Id.* at 861 n. 1.

Additionally, the defendant received other pain medications regularly and had suffered severe blood loss resulting in severe shock. *Id.* at 861. The testimony regarding the defendant's mental condition at the time of the interviews was ambiguous. *Id.* at 863.

Despite Mitchell's assertions, the present case is clearly distinguishable from *Vincik* and *Reddish.* During the interview, Mitchell was not under the influence of any narcotic, was in stable condition after surgery on his hand, and remained in the hospital. The testimony describing Mitchell's mental state was uncontroverted. The record indicates that Mitchell willingly talked with Agent Rumpf. Mitchell presented no evidence demonstrating the involuntariness of his statements, and failed to meet his burden. The State, therefore, clearly rebutted the presumption that Mitchell's statements were involuntary. We decline to hold Mitchell's statements involuntary based solely on the amount of time he spent in custody. Viewing the totality of the circumstances, the trial court could readily infer from all the facts presented that Mitchell's statements were voluntary.

### JOINT TRIAL

Mitchell complains that the charges of first degree murder and attempted first degree murder were improperly tried together. We disagree. It is within the court's discretion whether to order joint trials, and such a decision will not be reversed absent an abuse of discretion, such as when joining separate matters deprives or threatens to deprive the defendant of a fair trial. *Black v. State,* 869 P.2d 1137, 1139 (Wyo. 1994). Joinder of offenses is controlled by W.R.Cr.P. 8 and 13. Mitchell challenges the propriety of the joinder, arguing that the court's refusal to sever his cases prejudiced his interests. Accordingly, Mitchell must present facts illustrating that real prejudice resulted from combining the several offenses into one trial and that acquittal would have been more likely had the trials been conducted separately. *Pote v. State,* 695 P.2d 617, 624 (Wyo.1985).

The State requested joinder, asserting: the evidence of shooting the police officers was directly tied to the murder of Sidwell; the same evidence would be used at both trials; and judicial economy. In our review, we apply the considerations set forth in *Dorador v. State,* 768 P.2d 1049, 1052 (Wyo.1989). The first question, whether all the evidence admissible in the joint trial would have been admissible in a separate trial on each charge, we answer affirmatively. The police sought to question Mitchell about Sidwell's murder, without planning to arrest him. Mitchell reacted to the police presence by shooting two police officers. A defendant's activity after committing a crime in an attempt to evade detection is "relevant circumstantial evidence of guilt." *Hopkinson v. State,* 632 P.2d 79, 103 (Wyo.1981). Mitchell's attempted murder of the police officers was part of the relevant circumstantial evidence to prove his involvement in Sidwell's murder and, therefore, would have been admissible in the first degree murder case. Conversely, the evidence of Sidwell's murder would have been admissible to prove motive in the attempted murder trial.

Since sufficient evidence existed to prove Mitchell murdered Sidwell, the evidence of the attempted murders did not improperly influence the jury to convict Mitchell for Sidwell's murder and, thus, Mitchell failed to establish prejudice. If the first prong of the *Dorador* test is satisfied, analysis of the second prong is unnecessary. *Tabor v. State,* 616 P.2d 1282, 1285 (Wyo.1980); *Dorador,* 768 P.2d at 1052. Because the evidence would have been admissible at a separate trial on each offense, joinder was within the bounds of reason under the circumstances, and we find no abuse of discretion.

### PROSECUTORIAL MISCONDUCT

We must examine this issue using the plain error analysis because Mitchell failed to object to the prosecutor's conduct during trial. *Harper v. State,* 970 P.2d 400, 403 (Wyo.1998). For an error to rise to plain error, three requirements must be met: the record must clearly describe the facts alleged as error; the error must violate a clear and unequivocal rule of law; and the error must affect a substantial right resulting in material

prejudice. *Johnson v. State*, 936 P.2d 458, 465 (Wyo.1997); *Bradley v. State*, 635 P.2d 1161, 1164 (Wyo.1981). In reviewing a claim of prosecutorial misconduct, we consider the entire closing argument and evaluate it in the framework of the entire record, not just particular phrases or sentences at issue, to decide if prosecutorial misconduct occurred, which prevented a fair trial. *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997); *Vargas–Rocha v. State*, 891 P.2d 763, 771 (Wyo.1995). While prosecutors are not given carte blanche, they have wide latitude in the scope of their argument. *Id.*

Mitchell claims that the prosecutor induced the jury to disregard Mitchell's defense by improperly interjecting his own opinions into the closing argument with these comments:

> [The Defense] has suggested to you that it was shocking, in his words, shocking that Mont Mecham didn't allow a mother to talk to her son under the circumstances. Mr. Mecham, Lieutenant Mecham was investigating a murder. I would suggest to you that it's shocking that the Defense could stand before you and say that their client, who walked around the corner, snuck around the corner, fired a shotgun into this man's neck and created that wound, didn't intend to kill him. *I believe* that's shocking.

(Emphasis added.)

Furthermore, Mitchell claims the prosecutor's comments regarding reasonable doubt were also improper.

> You don't leave your common sense and your life experience at the door when you begin your deliberations ... And I will suggest to you right now in response to what—something [the defense] said, [regarding the theory that T's neighbor was responsible for her murder] ... then [the defense] is right, and there must be reasonable doubt, but *I think* that's a different world and a different universe than what you know to be the truth in this case.

(Emphasis added.)

■ The occasional "I think" or "I believe" in a prosecutor's argument does not always rise to the level of prejudicial error. *Browder v. State*, 639 P.2d 889, 895 (Wyo. 1982). Viewing the entire closing argument

in conjunction with the record, it is clear the prosecutor was using legitimate argument to respond to Mitchell's defense theories. During trial and in closing argument, Mitchell presented the defense that someone else killed Sidwell. The defense argued Mitchell's response to the police was motivated by his desire to protect his mother and that he acted in the heat of passion. With his comments, the prosecutor was countering the defense's theories and was not attempting to convey his personal opinion to the jurors.

■ Even assuming that the prosecutor's remarks were improper, the error was not so atrocious that a substantial right was affected, resulting in material prejudice. *See Harper*, 970 P.2d at 405. Mitchell failed to show, with reasonable probability, that he would have received a more favorable verdict without the prosecutor's statements. Viewing the record as a whole, we cannot conclude that the prosecutor improperly expressed his personal beliefs or deprived Mitchell of a fair trial. Mitchell has not shown that he was denied a substantial right or suffered material prejudice; therefore, the prosecutor's remarks were not fundamentally unfair to the trial process, and no error occurred.

### FORFEITURE

■ The trial court ordered Mitchell to reimburse the public defender's office $2400, to be partially paid from the forfeiture of Mitchell's truck. Mitchell contests the court's reimbursement method, but not the reimbursement amount. This court has the power to correct an improper divisible sentence by striking the inappropriate portion, without resorting to further proceedings. *Barnes v. State*, 670 P.2d 302, 304 (Wyo. 1983); W.R.Cr.P. 35(a). While the court has authority to order defendants to pay for public defender services, the statute granting such power is silent on the appropriate method to use. Wyo. Stat. Ann. § 7–6–106(c) (Michie 1997). This court has not previously issued a ruling on the matter; however, we agree with both parties that neither Wyo. Stat. Ann. § 35–7–1049 (Michie 1997) dealing with forfeitures, nor § 7–6–106(c) authorizes the court to pursue a forfeiture action.

■ Before ordering reimbursement, the trial court must first determine the defen-

dant's ability to pay. *Collier v. State,* 920 P.2d 265, 266 (Wyo.1996); *Seaton v. State,* 811 P.2d 276, 283–84 (Wyo.1991). If the defendant can pay, the court may order reimbursement, creating personal liability in the defendant. After the debt is reduced to a judgment, the State may seek execution of the judgment to seize the defendant's property, not subject to exemption,[1] to satisfy the judgment. To pursue such a course of action, the State must follow the applicable statutes regarding judgment and execution.

The trial court erred by improperly ordering forfeiture of Mitchell's truck, an act unauthorized by law. We, therefore, modify the sentence to strike out the forfeiture of Mitchell's truck, while still allowing reimbursement of public defender fees.

## CONCLUSION

The police adhered to *Miranda* requirements when interviewing Mitchell. With specific evidentiary detail, the State successfully established the voluntariness of Mitchell's statements. The trial court, therefore, properly denied Mitchell's suppression motions. The trial court did not abuse its discretion by joining Mitchell's related multiple charges into one trial. The prosecutor's remarks in the closing argument do not rise to the level of plain error. Finally, the trial court's order subjecting Mitchell's truck to forfeiture was not in accordance with law and, thus, we strike the inappropriate portion of the order.

Affirmed, as modified.

---

1. Article 1, Chapter 20 of the Wyoming Statutes discusses exempt property. Furthermore, Wyo. Stat. Ann. § 1–15–511 (Michie 1997) calculates the amount that can be garnished from the judgment debtor's wages. Wyo. Stat. Ann. § 1–20– 106(a)(iv) (Michie 1997) states that a motor vehicle is exempt up to $2400.