# Third District Court of Appeal

## State of Florida

Opinion filed February 4, 2015.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D12-651
Lower Tribunal No. 06-1372

————————————

**The State of Florida,**
Appellant,

vs.

**Andrew Cummings,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Yvonne Colodny, Judge.

Pamela Jo Bondi, Attorney General, and Robert Martinez Biswas, Assistant Attorney General, for appellant.

S. Patrick Dray, for appellee.

Before SUAREZ, ROTHENBERG, and LAGOA, JJ.

SUAREZ, J.

The State appeals the trial court's grant of Andrew Cummings' Motion to Suppress. We affirm. In January 2006 a City of Miami police detective was

ordered to respond to an apartment from which a 911 call originated. At that time, the detective was being "shadowed" by a crew from the television show *The First 48*. The crew recorded the ensuing investigation and, eventually, a heavily redacted version of the investigation was aired.[1]

By the time the detective arrived at the scene, the victim, an adult male, had been pronounced dead in one room of the apartment. The other occupant of the apartment told a police officer that a white male, who he described, had been in the apartment the previous night drinking and using drugs with the victim. The occupant also told the officers that on the day of the 911 call, the white male, who was covered in blood, knocked on the door of the bathroom in which the occupant was showering and said "help me." The occupant told him to leave the apartment.[2]

Another witness, who saw the white male in the elevator of the apartment complex, gave a similar description of him and stated he had blood smeared on him. During the elevator ride, the white male told the witness that "his boyfriend had just stabbed him." A security guard at the complex also told the officers that he saw the white male and gave a matching description, but did not indicate that he made any effort to follow the person or obtain any help for him.

During the questioning of the witnesses, a report was received about a white male running through yards in the vicinity. Following that report, the Defendant

---

[1] The remaining portions of the video were destroyed by the television crew. Apparently, no effort was made by the City of Miami to request retention of the full video.

[2] It is unclear from the briefs how long after this occurred that 911 was called.

was discovered under a handicap ramp at a nearby home covered in blood and convulsing. The Defendant gave a false name when asked for his identity by rescue personnel. The rescue personnel also asked the Defendant what happened and he stated: "I don't know." He gave the same response when asked by the detective. The Defendant was transported to Jackson Memorial Hospital and was followed there by a police officer, but the officer was not specifically instructed to detain him. Nevertheless, an officer remained at the hospital the entire time the Defendant was being treated.

The afternoon of the next day, at the direction of the detective, crime scene investigators photographed the Defendant and collected fingernail scrapings and DNA swabs from his hands and confiscated his clothing. At approximately midnight that day, the detective arrived at the hospital as the Defendant was being discharged. The detective, who was accompanied by three other officers, advised the Defendant that "he needed him" to accompany the detective to the police station. The Defendant was transported to the police station in hospital scrubs and in the back of a police vehicle. *The First 48* video shows the Defendant walking into the police station accompanied by a much larger, uniformed officer who is holding "flexi-cuffs" in his right hand.

The video also shows the beginning of the questioning of the Defendant who is asked what happened to his head. However, the video shows only five minutes of questioning and it is undisputed that the questioning actually lasted two hours.

It is also undisputed that the Defendant fell asleep during the two-hour interrogation and at different points during the interrogation gave responses that the detective viewed as evidence that the Defendant did not understand the question.

According to the detective, during the questioning the Defendant gave his actual name and told the detective that he had been at a party, that people were using drugs, a fight broke out but that he did not remember anything else. The detective stated that he then asked the Defendant if he knew the victim and the Defendant said he had known him for 5-7 years, but had not seen him for a week. The video shows the detective leaving the interrogation room and advising the camera crew that the Defendant "is lying."

The detective testified that after discussing whether the Defendant knew the victim, he then read the Defendant his Miranda rights.[3]  According to the detective, he then advised the Defendant that he was investigating a homicide and the Defendant looked surprised and asked what he meant. When the detective said the victim had died, the Defendant stated "get the ____ out of here." After more discussion, the Defendant was told that the victim's blood was found on his hands, and he admitted that he was in the apartment in the morning of the incident and later that he and the victim had been in a fight during which he grabbed a towel bar to fight off the victim, who was much larger than him. The Defendant also stated

---

[3] A Miranda form signed at 2:00 a.m. was admitted into evidence, but the reading of the rights is not on the video.

that victim was "downstairs ****ing some other guy.  He comes back up and I told him I was leaving.  Somehow there was an altercation in the bathroom, I don't really know. … I tried getting him off me a couple of times, and he's high.  I had to ****ing smash him or something a couple of times."  The detective then said he wanted to take a sworn statement and the Defendant invoked his right to counsel.  The Defendant was arrested two hours later.

The Defendant moved to suppress "all oral statements, confessions and admissions made by the Defendant to the police or other agents of the State of Florida."  As grounds for the motion, the Defendant argued he was

> [A]pprehended by numerous police officers [] when he was found outside near a house, bleeding and going into convulsions. … The police guarded the Defendant while he was receiving treatment. … Immediately upon discharge, he was met by two detectives [] and transported by yet another officer to the station for interrogation. …
>
> Any statement made from the time he was detained and subsequently arrested prior to Miranda warnings was obtained in violation of the Defendant's right to counsel.  Moreover, any such statement was also obtained in violation of the Defendant's right to remain silent because he was in custody and being interrogated at the time by the police about a murder investigation.
>
> Furthermore, the statements were also the product of a statement obtained earlier without the benefit of Miranda rights. … The statements were not made knowingly, intelligently or voluntarily in violation of Miranda. …

After the hearing on the motion to suppress, the trial court made oral rulings which included a statement that the

Defendant "was in custody [] when he was transported to the hospital and while he was at the hospital he was not free to leave." The trial court also ruled that the Defendant's statements made when he was first found were not voluntary because "he was in no condition to voluntarily make statements to that." In a later written order the trial court ruled that:

> Defendant was illegally detained during his pre-Miranda statements. … a reasonable person in Defendant's position would not have felt free to leave, or disengage from, the police contact existing in this case. As such, defendant was in 'custody' when his statements were taken. … The Court suppresses Defendant's pre-Miranda statements. … Defendant was consistently in custody for several hours (i.e. from the time he was transported to the hospital to the moment he was escorted to the interview room.).

After later proceedings on a motion for rehearing, the State filed this appeal.

We affirm suppression of all statements made by the Defendant because the trial court was correct to conclude that the Defendant was in custody at the time all statements were made, see Ramirez v. State, 739 So. 2d 568, 573 (Fla. 1999), and in finding that his post-Miranda statements were the result of a deliberate decision to delay issuing Miranda warnings to the Defendant. Ross v State, 45 So. 3d 403 (Fla. 2010). Specifically with respect to the statements made when the Defendant was first discovered, there is some confusion in the record as to whether the Defendant made any statements to rescue personnel which could be considered separately from statements made to the detective. Despite the confusion, the Order on appeal states: "[w]hile being treated

6

by Fire Rescue, [the detective] approached Defendant to speak to him" and "[w]hile being treated, [the detective] asked Defendant for his biographical information and for an explanation of 'what happened.' Defendant provided the name Andrew Gil …." Because the Order indicates that the questioning was done by the detective, we affirm the suppression of that statement as well. Moreover, we conclude that the trial court was also correct to initially find that the Defendant was in no condition to make voluntary statements. Reddish v. State, 167 So. 2d 858, 863 (Fla. 1964).

The trial court also ruled that the video tape of *The First 48* could not be shown to the jury. We also affirm that ruling because the video tape was so heavily redacted that the available portions were deprived of relevance. Martinez v. State, 761 So. 2d 1074 (Fla. 2000); Morrison v. State, 546 So. 2d 102 (Fla. 4th DCA 1989).

Affirmed.