# IN THE COURT OF APPEALS OF IOWA

No. 15-0726
Filed June 15, 2016

**STATE OF IOWA,**
        Plaintiff-Appellant,

**vs.**

**THADDEUS JOHN ELLENBECKER,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Winnebago County, DeDra L. Schroeder, Judge.

        The State appeals the district court's order granting the defendant's motion to suppress. **AFFIRMED.**

        Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellant.

        Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellee.

        Heard by Vogel, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

The State appeals the district court's order granting the defendant's motion to suppress statements made by Thaddeus Ellenbecker to law enforcement. The State claims the statements were voluntary and, if the statements were not voluntary, the evidence would have inevitably been discovered. We affirm the district court's order.

## I.    BACKGROUND FACTS AND PROCEEDINGS

This is the second appeal arising from Ellenbecker's November 2011 charges of burglary in the second degree and arson in the second degree. Ellenbecker was tried separately on each charge and eventually convicted of both charges. He appealed to our court and we reversed the convictions and remanded for a new trial. *See State v. Ellenbecker*, No. 12-2229, 2014 WL 1999291, at *8–9 (Iowa Ct. App. May 14, 2014) (*Ellenbecker I*). The facts leading to Ellenbecker's charges are detailed in our first opinion. *Id.* at *1–6. We find it unnecessary to repeat the facts herein.

In *Ellenbecker I*, we found the hospital interviews of Ellenbecker by law enforcement were custodial interrogations in violation of his *Miranda* rights and we remanded for a new trial, reasoning:

> Ellenbecker was in police custody at the time he was physically restrained and shot at his apartment complex. Not only did the DCI agents initiate contact with Ellenbecker in the hospital, their prior custodial actions put him in the hospital and an officer accompanied him on the ambulance ride to the hospital. Although the DCI agents were dressed casually and did not threaten or coerce Ellenbecker during questioning, it is undisputed there was a significant police presence at the hospital—basically he was "under guard." For example, two officers, one of whom rode with Ellenbecker in the ambulance, were in the room when the DCI agents arrived. The ambulance-ride officer remained on the floor,

although he was not in the room during the agents' questioning. But he returned to the room during both breaks the DCI agents took in their two-hour interrogation on that first night.

Also on the first night, the DCI agents took the initiative to contact medical staff and arrange for Ellenbecker to have medical staff *constantly present in his room* after they left the hospital at 1:35 a.m. The hospital complied and the medical staff person was in the room when different DCI agents returned in the morning to question him. Ellenbecker was arrested at 12:30 p.m., shortly after this questioning concluded.

While the DCI agents told Ellenbecker the arrangement with medical staff was to insure he would not harm himself, objectively such a *medical* decision is within hospital expertise. The initiation, specific direction, and arrangements for staffing made by law enforcement leads to the conclusion Ellenbecker's custody continued uninterrupted during his hospitalization. At no point during his hospital stay was Ellenbecker left alone in his room. Clearly, law enforcement acted to "monitor" his hospital stay. *See* [*United States v.*] *Martin*, 781 F.2d [671,] 673 [(9th cir. 1985)].

Based on these facts and circumstances and using an objective test, a reasonable person in Ellenbecker's position would have understood that he remained in police custody at the hospital, in spite of the agents' frequent and continued assurances he had not been arrested when handcuffed and was not under arrest or in custody at the hospital. The October 20–21 hospital interrogations constituted custodial interrogations that needed to be preceded by *Miranda* warnings. No one fact is controlling but taken together, the facts compel this conclusion. Any statements made by Ellenbecker after he was taken into custody at the apartment complex are therefore inadmissible

*Id.* at *8–9. We declined to address whether Ellenbecker's incriminating statements were involuntary because we found the custodial issue dispositive of the appeal. *Id.* at *1 n.1.

On remand, Ellenbecker demanded a jury trial and change of venue; both were granted. Ellenbecker filed a motion in limine (which was later treated as a motion to suppress) claiming the evidence from his illegally obtained statements, specifically about a gun store and a gun part, should be excluded. The State

resisted, claiming the evidence would have been discovered even without the information obtained from Ellenbecker.

The court held a suppression hearing on January 21, 2014, and entered a ruling on January 26, granting Ellenbecker's motion. The State filed a motion to reconsider. Upon the State's request, the district court held a full evidentiary hearing on the motion. The court reaffirmed its earlier ruling. The State filed an application for discretionary review, which was granted on June 5, 2015.

## II. STANDARD AND SCOPE OF REVIEW

"Under both the State and Federal Constitutions," we review constitutional claims de novo. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). This review requires us to make an independent evaluation of the totality of the circumstances as shown by the entire record, including the evidence presented at the suppression hearing. *State v. Lowe*, 812 N.W.2d 554, 566 (Iowa 2012). Because of the district court's opportunity to evaluate the credibility of witnesses, we will give deference to the factual findings of the district court, but we are not bound by them. *Id.*

## III. MERITS

### A. Voluntariness

The State claims the district court improperly suppressed the statements obtained from Ellenbecker because they were voluntary.[1] Specifically, the State

---

[1] The State claims error is not preserved on any issue involving the Iowa Constitution since it was not argued by Ellenbecker below. An issue must be raised and decided by the district court to preserve error for appeal. *Lamasters v. State*, 821 N.W.2d 856, 863–64 (Iowa 2012). "However, when a party does not indicate the specific constitutional basis for a claim to which parallel provisions of the federal and state constitutions apply, we regard both the federal and state constitutional claims as preserved." *State v. Ary*, ___ N.W.2d ___, ___, 2016 WL 1391878, at *9 (Iowa 2016). We find Ellenbecker's

makes three claims on why the suppression was improper: (1) the confessions were voluntary under controlling state and federal precedent because only the most extreme instances of police coercion—the functional equivalent of torture—require suppression under the Due Process Clause; (2) the precedent set by *United States v. Patane*, 542 U.S. 630, 637 (2004), requires vacating the district court's suppression order; and (3) even if the statements were involuntary, the State was permitted to use the statements for impeachment purposes.

The State carries the burden of proof, by a preponderance of the evidence, to demonstrate Ellenbecker's statements were voluntarily. *State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982). The test for voluntariness is whether the "totality of circumstances demonstrates that the statement was the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired." *State v. Vincik*, 398 N.W.2d 788, 790 (Iowa 1987). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" under the Fourteenth Amendment. *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *see also State v. Hibdon*, 505 N.W.2d 502, 505 (Iowa Ct. App. 1993). Other factors in determining voluntariness include:

> The defendant's knowledge and waiver of his *Miranda* rights, the defendant's age, experience, prior record, level of education and intelligence, the length of time defendant is detained and interrogated, whether physical punishment was used, including the deprivation of food or sleep, defendant's ability to understand the questions, the defendant's physical and emotional condition and his reaction to the interrogation, whether any deceit or improper

---

constitutional references in his motion in limine and the district court's reliance on case law invoking both the United States and Iowa Constitutions adequate to preserve error for our review.

promises were used in gaining the admissions, and any mental weakness the defendant may possess.

*Vincik*, 398 N.W.2d at 790 (citation omitted); *see also State v. Whitsel*, 339 N.W.2d 149, 153 (Iowa 1983).

Here, Ellenbecker claims the statements made to police officers at the hospital, following being shot by law enforcement, were not voluntary. He relies on the following reasons to show his statements were involuntary: he was in pain from the gunshot wound, tired, and under the influence of pain medication; he was interviewed multiple times throughout the night with little sleep; at times he did not understand the officer's questions; he was depressed and suicidal; and he was in a vulnerable position due to being in the hospital.

The State disagrees and claims in order for the court to exclude evidence on voluntariness grounds it must be an extraordinary case where the police conduct essentially amounts to torture of the defendant. We disagree.

While intoxication is not singularly enough to render a confession involuntary,[2] the totality of the circumstances—including the involuntary nature of Ellenbecker's intoxication, the officers' coercive treatment of him before and after the shooting, and Ellenbecker's mental state—supports a finding Ellenbecker's confessions were not voluntary.

---

[2] The common theme shared by these cases is the defendants voluntarily took some sort of controlled substance, which induced their intoxicated state. *See State v. Countryman*, 572 N.W.2d 553, 558–59 (Iowa 1997) (finding defendant, who voluntarily ingested controlled substances, gave voluntary statements); *State v. Edman*, 452 N.W.2d 169, 171 (Iowa 1990) (finding the statements made by a drunk driver were voluntary); *State v. Wilson*, 264 N.W.2d 614, 614 (Iowa 1978) (finding a defendant's statements, made while possibly under the influence of heroine, were voluntary due to a lack of police coercion*); State v. Rank*, 214 N.W.2d 136, 137 (Iowa 1974) (finding defendant's unelicited statements made while high on a controlled substance were voluntary).

In finding Ellenbecker's statements were not voluntary, the district court relied on the somewhat analogous case *State v. Vincik*. While there are differences between the factual background in *Vincik* and Ellenbecker, we find it controlling. In *Vincik*, the defendant (Vincik) shot his wife and then shot himself in the head. *Vincik*, 398 N.W.2d at 790. Vincik called 911 and was brought to the hospital where he underwent "major surgery." *Id.* Vincik remained hospitalized following the surgery, and was arrested a few weeks later at the hospital. *Id.* At that time, hospital personnel released Vincik (in a wheelchair) to police custody; they believed Vincik was being taken to the Oakdale Medical Classification Center for further treatment and a psychiatric evaluation. *Id.* at 791. Instead, the police took Vincik to the police station where he read and signed "a standard rights waiver form." *Id.* at 790. Vincik was then interviewed for three hours. *Id.* He admitted to having "recent suicidal thoughts brought on by" his past Vietnam War experiences and to murdering his wife. *Id.* At trial, a neurosurgeon testified the type of brain damage suffered by Vincik usually results "in a lack of inhibition and a lack of appropriate response to questions and situations." *Id. at* 791. The medical records showed Vincik had undergone a "surgical procedure" and twenty milligrams of valium had been administered. *Id.* The neurosurgeon testified this amount would make the "average male" "not responsible" for any statements for six hours following this dosage. *Id.* Vincik was also being administered the medications phenobarbital and Dilantin. *Id.* Our supreme court found Vincik's waiver of his *Miranda* rights and the statements made to the police were involuntary. *Id.* at 793. In a combined analysis of the two issues, the court reasoned:

> Vincik's confession was the product of tough police interrogation and a mind enfeebled by brain damage, a surgical procedure, fatigue, medication and drugs. We find credible the medical testimony concerning the severity of Vincik's brain damage, the adverse effects upon him of the medication and drugs administered during the surgery that afternoon, and his infirm and fatigued mental and physical condition that evening. Vincik was not capable of giving to the interrogating police officers, and did not give, the kind of knowing and voluntary statement that could constitutionally be used in evidence against him.

*Id.*

Here, reviewing the "totality of the circumstances," we find Ellenbecker received a similar "tough police interrogation," amounting to the necessary "coercive police activity." *See Connelly*, 479 U.S. at 167. The length of the police interrogation alone would be insufficient for our finding. However, the length of the interrogation, compounded by the fact law enforcement had shot Ellenbecker prior to his confessions, the fact the officers declined to *Mirandize*[3] Ellenbecker, and the continuous presence of law enforcement during Ellenbecker's hospital stay support our finding.

In addition to the evidence supporting police coercion is the evidence concerning Ellenbecker's mental and physical state during the interrogation. The evidence showed Ellenbecker received multiple dosages of various opioid based pain killers immediately prior to the officers' questioning. Dr. Ron Larsen, a psychiatrist and former chief medical officer at the hospital that provided treatment to Ellenbecker, testified about Ellenbecker's mental and physical state

---

[3] "[W]hether the State proved by a preponderance of the evidence that the statement received was made by defendant after an effective waiver of his *Miranda* rights and whether such statement was voluntary" are separate issues. *Whitsel*, 339 N.W.2d at 152. However, as previously noted, a failure to issue *Miranda* warnings is a factor to be considered in the totality of the circumstances.

during this time. Dr. Larson described the effect the opioid pain killers would have on a patient in Ellenbecker's condition:

> Given the amounts of medicines and the pain that we are talking about here, I do not let law enforcement agents speak to patients when they're under this—the effects of opioids. To explain, opioids are known to cause euphoria, as I mentioned. It's that up, floaty feeling. But they can also cause dysphoria. That's a sadness or a down feeling or just a not being here kind of feeling.
>
> There's also side effects. As I mentioned, these medicines cause side effects of what we call opioid intoxication, delirium. Now, we can talk more about delirium, but delirium is acute confusional state, so the medicines themselves cause confusions.
>
> And so what I'm concerned about is that due to these effects, then, any questions or statements or perceptions while under the effect of opioids can't be counted on to be accurate. My—a person, you can't count on their dreams or their nightmares to be accurate representations of what really happened. So the information that law enforcement would obtain, given the medications that we've talked about, would not likely be from the individual but from the altered mental state. I don't know how to read that. Nobody knows how to do that. But I think it's more likely to be from an altered mental state than—than from the person's individual voluntary statements.
>
> And—and so I—I don't see any benefit really for law enforcement to be involved until the opioids have been decreased, which we do in 24 to 48 hours, and then I would allow enforcement agents to speak with—with a patient to gather accurate information.

Due to Ellenbecker's mental and physical state, compounded by our findings concerning the officers' custodial interrogation in *Ellenbecker I* and the officer's coercive treatment, we conclude Ellenbecker's statements to police were not the product of an "essentially free and unconstrained choice." *See Vincik*, 398 N.W.2d at 790. His "capacity for self-determination" was "critically impaired" by the impact of the opioid drug on his already weakened mental and physical condition—Ellenbecker's will was overborn by the officers' conduct. *See id.* We affirm the district court's suppression of Ellenbecker's statements.

Because we have found Ellenbecker's statements were involuntary, we find *Patane* inapplicable. *Patane*, 542 U.S. at 637 ("The [Self-Incrimination] Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements."); *see, e.g.*, *State v. Chiavetta*, No. 05-1911, 2007 WL 1828323, at *5 (Iowa Ct. App. June 27, 2007) (finding *Patane* applicable since the defendant's statements were voluntary). Therefore, the "fruits" of Ellenbecker's statements are inadmissible.

The State also claims, in the alternative, even if we find Ellenbecker's statements the evening of October 20 and the early morning hours of October 21 were involuntary, his statements made to police at 10:40 a.m. on October 21 were voluntary. We find error has not preserved on this issue as it was not raised or ruled upon by the district court. *See Lamasters*, 821 N.W.2d at 863–64 (Iowa 2012).

## B. Inevitable Discovery

The State claims if Ellenbecker's statements were not voluntary, the physical evidence would have been inevitably discovered from an independent source. Ellenbecker claims the State has not preserved error on this claim.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal." *Id.* "If the court's ruling indicates that the court *considered* the issue and

necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." *Lamasters*, 821 N.W.2d at 864 (citation omitted).

Here, the State raised its inevitable-discovery argument in its resistance to Ellenbecker's motion to suppress. The issue was not explicitly raised at any of the hearings leading up to the district court's ruling on the motion to suppress. The district court did not discuss this issue, even tangentially, in its ruling granting Ellenbecker's motion to suppress. The State did not file a motion requesting the district court to rule on this issue. Therefore, we find error has not been preserved.

## IV.    CONCLUSION

We affirm the district court's order granting Ellenbecker's motion to suppress. We find the State's claim concerning the inevitable-discovery doctrine has not been preserved for our review.

**AFFIRMED.**